UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

CURTIS HAWTHORNE                                        CIVIL ACTION

VERSUS                                                  NO. 20-3017

DARREL VANNOY, WARDEN                                   SECTION "L"(2)

## REPORT AND RECOMMENDATION

This matter was referred to a United States Magistrate Judge to conduct hearings, including an evidentiary hearing, if necessary, and to submit proposed findings and recommendations for disposition pursuant to 28 U.S.C. §§ 636(b)(1)(B) and (C) and, as applicable, Rule 8(b) of the Rules Governing § 2254 Cases. Upon review of the entire record, I have determined that a federal evidentiary hearing is unnecessary.[1] For the following reasons, I recommend that the petition for habeas corpus relief be **DISMISSED WITH PREJUDICE**.

## I.    FACTUAL BACKGROUND

Petitioner Curtis Hawthorne is a convicted inmate incarcerated in the Louisiana State Penitentiary in Angola, Louisiana.[2] On October 17, 2013, Hawthorne was charged by a bill of indictment in Orleans Parish with aggravated rape, aggravated kidnapping, and armed robbery.[3] Hawthorne pled not guilty on October 22, 2013.[4] The Louisiana Fourth Circuit Court of Appeal summarized the established facts as follows:

---

[1] A district court may hold an evidentiary hearing only when the petitioner shows either the claim relies on a new, retroactive rule of constitutional law that was previously unavailable (28 U.S.C. § 2254(e)(2)(A)(i)) or the claim relies on a factual basis that could not have been previously discovered by exercise of due diligence (*id*. § 2254(e)(2)(A)(ii)) *and* the facts underlying the claim show by clear and convincing evidence that, but for the constitutional error, no reasonable jury would have convicted the petitioner. *Id*. § 2254(e)(2)(B).

[2] ECF No. 5, at 1.

[3] State Record Volume (hereinafter "St. R. Vol.") 3 of 9 at 1-4, Bill of Indictment, 10/17/13.

[4] St. R. Vol. 3 of 9 at 14, Min. Entry, 10/22/13.

Victim testified that she and her friends arrived in the French Quarter around midday on February 8, 2013. At about 2:30 a.m. on February 9, 2013, Victim became separated from her friends so she decided to hail a taxi and return to her hotel. Victim reported that, although she had been drinking during that day, she was aware of what was happening around her and was not intoxicated at the time she decided to leave Bourbon Street. Victim stated that she did not have a working cell phone with her as hers had been water damaged the night before. After a long, unsuccessful search for a taxi, she flagged down Defendant and asked if he could drive her to her hotel near the Superdome. Defendant asked if she had cash, and when she said yes, he told her to get in the car. Although Defendant's vehicle did not bear any taxi cab insignia, Victim assumed he was an Uber or Lyft driver. After Defendant drove around for a while, Victim became concerned that they had not arrived at her motel. Just then, Defendant stopped the car in a secluded area and demanded that she have sex with him. When she refused, he became agitated, told her that "things could get a whole lot worse" then pulled a silver handgun and ordered her to get into the back seat and disrobe. Defendant also got into the back seat and then orally and vaginally raped her. After the attack, Defendant drove a short distance to a parking lot and ordered her out of the vehicle as he drove away with her purse and shoes in the back seat. Victim ran into a nearby building and called the police. She told the 911 operator she had been robbed. She explained that she did not mention rape initially because she was so "shocked," "embarrassed and horrified." When the police arrived, Victim told them about everything that had happened to her, including the aggravated rape. They drove her to the hospital, where she underwent a physical examination.

A few days after the attack, Victim discovered unauthorized purchases on her credit card, the same credit card that was left in Defendant's car. Victim reported the unauthorized purchases to the sex crimes detective. Victim testified Defendant forced her to have sex and specifically denied that the sex was consensual.

Former New Orleans Police Department ("NOPD") Officer Viviana Ferreira ("Officer Ferreira"), an eight-year employee of the NOPD, testified that on February 9, 2013, she was assigned to the Sixth District night watch and was dispatched, along with Sergeant Richard Welch ("Sgt. Welch"), to the Guste Apartments to meet with Victim. Upon arriving, Officer Ferreira noted that Victim was disheveled, crying, distraught, shaking and shoeless. When Officer Ferreira interviewed Victim, Victim was coherent and showed no signs of being intoxicated. Officer Ferreira testified regarding Victim's account of the circumstances of the crime, which was consistent with Victim's testimony. After her interview of Victim, Officer Ferreira transported Victim to the hospital, where she underwent a rape examination. Officer Ferreira then notified the sex crimes unit and handed the investigation over to Detective Vernon Haynes.

Sgt. Welch, an officer with the NOPD for seventeen years, testified that he was dispatched to the Guste Apartments to investigate this crime. Sgt. Welch spoke

with Victim at the same time Officer Ferreira interviewed her.  He corroborated Officer Ferreira's testimony concerning Victim's appearance, demeanor, and account of the crime.

A registered sexual assault nurse examiner ("SANE Nurse") at University Hospital in New Orleans, who was qualified as an expert in the field of sexual assault examination, testified that she performed the rape and pelvic examinations on Victim in the early morning hours of February 9, 2013.  SANE Nurse noted that Victim was disheveled, fearful, emotional and crying but able to give a coherent statement.  Victim did not appear intoxicated; therefore no toxicology screening was performed.  SANE Nurse documented Victim's account of what happened to her and compiled the information into a nine-page "Forensic Sexual Assault Evaluation" report, which was admitted into evidence.  According to this report, Victim stated that she was trying to find a taxi cab in the French Quarter when a man pulled up and offered to drive her to her hotel.  Instead, the man drove her to a secluded residential area, put his mouth on her vagina and raped her at gunpoint. Victim reported that Defendant used a condom but SANE Nurse reported swabs were still taken because Victim had reported oral sexual contact.  After the attack, the man drove her to another location and forced her out of the vehicle, driving away with her purse and other belongings.  SANE Nurse also observed, diagrammed, and photographed the physical injuries to Victim's body, including bruising and abrasions to the hands, knees, hip, and lower left abdomen area.  The diagram and photographs were admitted into evidence.

The State and defense stipulated that, during Victim's rape examination, two vaginal, two cervical, two external genitalia, and two rectal swabs were taken, and all contained Defendant's DNA.  Additionally, Defendant's seminal fluid was found inside Victim.

Sharon Jupiter also testified at trial.  Ms. Jupiter and Defendant have a son together but were no longer living together at the time of this incident.  Ms. Jupiter testified that Defendant was scheduled to pick up their son at Ms. Jupiter's residence on October 7, 2013; however, before Defendant arrived, a police officer came to her residence to arrest him.  Shortly thereafter, Defendant called Ms. Jupiter and asked whether she had called the police because he saw a police car parked in front of her house.  Defendant also asked her if he could pick up their son at the park, rather than at her house.  Ms. Jupiter agreed.  When Defendant arrived at the park, he showed her a gun he had hidden in his right front pocket, telling her he was wanted by the police.  A few minutes later, the police arrived, and Ms. Jupiter alerted them that Defendant was armed.  Defendant ran and was pursued and arrested by the police.

NOPD Detective Devin Joseph ("Det. Joseph"), a member of the Violent Offender Warrant Squad, assisted in the October 7, 2013 arrest of Defendant near a park on the corner of Franklin Avenue and Drew Street.  Det. Joseph noticed Defendant holding a bulge in his right waistband and running freely with his other

arm.  Det. Joseph chased Defendant for about a block to an abandoned lot, where he lost sight of him for about three seconds.  The chase continued when Defendant reappeared and ran toward Venus Street.  Det. Joseph noticed Defendant was no longer holding his pants with both hands, and the bulge in his waist band had disappeared.  Det. Joseph advised his fellow officers that Defendant had thrown away his gun.  After Defendant ran another block, Det. Joseph apprehended him, returned to where he had lost sight of Defendant and found the discarded loaded gun.

Detective Vernon Haynes ("Det. Haynes"), of the NOPD Sex Crime Unit testified that he was the lead detective on this case, and he spoke with Victim on February 9, 2013.  He noted that Victim could offer little in locating the scene of the attack because she was not from New Orleans.  Victim gave him a description of her assailant as an African American male with a dark complexion, in his 20's, wearing a fisherman style hat with his hair protruding from underneath and a polo shirt.  Victim told him her assailant drove off with her purse which contained several bank cards, a little cash, a broken IPhone, and make-up.  A short time after this incident, Victim's bank card reflected unauthorized charges against her account, including transactions at a gas station.  Det. Haynes attempted to obtain evidence identifying the perpetrator or his vehicle from the gas station's security video but was unsuccessful.  However, from DNA evidence obtained in the case, Det. Haynes was able to identify Defendant as Victim's assailant.  Det. Haynes was unsuccessful in speaking to Defendant to get Defendant's side of the story.  However, he did speak to a family member of Defendant's, and requested that the family member have Defendant contact him.  Det. Haynes noted in his report that Victim admitted drinking alcohol on the day of the incident.  However, he testified that he agreed in the decision reached by law enforcement and the district attorney's office that the sexual activity between Victim and Defendant was not consensual and thus secured a warrant for Defendant's arrest.

Defendant, age 23, testified on his own behalf that the sexual activity between him and Victim was consensual.  He admitted to having two prior misdemeanor convictions—domestic violence in 2011 and possession of stolen property in 2012.  Defendant testified that he and his girlfriend Dariann, who was pregnant with his second child, attended parades on the Friday before Mardi Gras in 2013.  After the parades, he and Dariann went to a few bars on Bourbon Street.  He drank a beer, after which he and Dariann left the French Quarter. Dariann complained that her feet hurt so Defendant walked alone to retrieve his car.  When he returned to the intersection of Canal and Bourbon Streets to pick up Dariann, he could not find her.  He claimed that, while he was stuck in bumper to bumper traffic on Canal Street, Victim flagged him down and asked him to help her find her hotel.  Victim offered to give him money for gas and got into the front seat of his car.  He denied telling Victim he was a taxi driver.  He stated that, as he drove Victim around looking for her hotel, they began to talk and get acquainted.  Defendant claimed they went to a secluded spot and had sex in the back of his car.  Defendant denied raping Victim, threatening Victim in any way, or showing her a gun.  He reported

4

that he later drove Victim to the train station, gave her cash to catch a taxi, and then drove to Canal Street to meet Dariann.  He denied stealing her purse.

Recounting his arrest, Defendant said he was unarmed, and he denied telling Ms. Jupiter he was wanted by the police.  He stated that he ran from the police because he feared being tasered.[5]

Hawthorne proceeded to a jury trial on December 1 and 2, 2014, and was found guilty as charged.[6]  The trial court denied Hawthorne's motion for new trial on January 5, 2015.[7]  On January 9, 2015, the trial court sentenced Hawthorne to life imprisonment at hard labor for the aggravated rape and aggravated kidnapping convictions, and imprisonment at hard labor for fifty years for the armed robbery conviction, each sentence to be served without benefit of parole, probation, or suspension of sentence and to be served concurrently.[8]

On direct appeal, Hawthorne's appointed counsel asserted two assignments of error: (1) insufficient evidence supported his convictions; and (2) the trial court erred in allowing Hawthorne's statement to Jupiter be presented to the jury.[9]  Hawthorne filed a pro se supplemental brief in which he similarly claimed insufficient evidence supported his conviction and raised an additional claim that the trial court erred in allowing testimony that he abandoned a gun as he fled the arresting police officers.[10]

On August 10, 2016, the Louisiana Fourth Circuit Court of Appeal affirmed Hawthorne's convictions and sentences.[11]  The court determined that there was sufficient evidence to support

---

[5] *State v. Hawthorne*, No. 2015–KA–0675, 2016 WL 4211361, at *1-4 (La. App. 4th Cir. Aug. 10, 2016) (footnotes omitted); St. R. Vol. 7 of 9, 4th Cir. Opinion, 2015-KA-0675, at 2-8, 8/10/16 (footnotes omitted).

[6] St. R. Vol. 3 of 9 at 53-54, Trial Mins., 12/1/14; *id.* at 57-58, Trial Mins., 12/2/14; St. R. Vol. 6 of 9 at 1-261, Trial Tr., 12/1-2/14; St. R. Vol. 8 of 9 at 1-131, Voir Dire Tr., 12/1/14.

[7] St. R. Vol. 3 of 9 at 63, Min. Entry, 1/5/15; *id.* at 68-74, Motion for New Trial, 12/29/14; St. R. Vol. 7 of 9, Hearing Trans., 1/5/15.

[8] Vol. 3 of 9 at 64, Sentencing Mins., 1/9/15; St. R. Vol. 7 of 9 at 1-6, Sentencing Tr., 1/9/15.

[9] St. R. Vol. 7 of 9, Appellate Brief, 2015-KA-0675, 12/11/15.

[10] *Id.*, Pro Se Supplemental Brief for Direct Appeal on Behalf of Curtis Hawthorne, 2015-KA-0675, 2/19/15.

[11] *State v. Hawthorne*, No. 2015-KA-0675, 2016 WL 4211361 (La. App. 4th Cir. Aug. 10, 2016); St. R.

his convictions.[12]  The court found that the State's delay in disclosing Hawthorne's statement to

Jupiter did not prejudice him, and that the trial court did not abuse its discretion in denying the

motion for mistrial and allowing the statement into evidence.[13]  Finally, the court found that the

trial court did not abuse its discretion in denying the motion to suppress as the gun was lawfully

seized.[14]  On May 26, 2017, the Louisiana Supreme Court denied Hawthorne's related writ

application without reasons.[15]

On July 12, 2018, Hawthorne filed a pro se application for post-conviction relief asserting

the following claims:

> (1) he was denied the right to a fair and impartial trial when the victim was allowed to
> remain in the courtroom, and his trial counsel was ineffective in failing to object;
>
> (2) the prosecutor committed misconduct during opening statements and closing
> arguments, and his trial counsel was ineffective in failing to object; and
>
> (3) the trial court erred in allowing him to be convicted by a non-unanimous verdict, and
> his trial counsel was ineffective in failing to object.[16]

On February 25, 2019, the trial court denied Hawthorne's application for post-conviction

relief.[17]  The trial court found that Hawthorne's trial counsel was not ineffective in failing to object

to the victim's presence in the courtroom.[18]  The trial court found that the prosecution did not make

any statements that society needed to be protected from people like Hawthorne nor did the

prosecutor make any comments similar to those alleged by Hawthorne.[19]  The trial court further

---

Vol. 7 of 9, 4th Cir. Opinion, 2015-KA-0675, 8/10/16.

[12] *Id.* at *5-7; St. R. Vol. 7 of 9, 4th Cir. Opinion, 2015-KA-0675, at 9-13, 8/10/16.

[13] *Id.* at *7-8; St. R. Vol. 7 of 9, 4th Cir. Opinion, 2015-KA-0675, at 14-17, 8/10/16.

[14] *Id.* at *8-9; St. R. Vol. 7 of 9, 4th Cir. Opinion, 2015-KA-0675, at 17-19, 8/10/16.

[15] *State v. Hawthorne*, 221 So. 3d 855 (La. 5/26/17); St. R. Vol. 7 of 9, La. Sup. Ct. Order, 2016-KO-1676, 5/26/17.

[16] St. R. Vol. 9 of 9, Application for Post-Conviction Relief, 7/12/18, at 3-4.

[17] St. R. Vol. 9 of 9, Ruling on Application for Post-Conviction Relief, 2/25/19.

[18] *Id.* at 2.

[19] *Id.* at 2-3.

found that it had instructed the jury that opening statements and closing arguments were not to be considered as evidence.[20]   Finally, the trial court found that the non-unanimous verdict was in accordance with the law, and that trial counsel was not ineffective in failing to object.[21]

On March 27, 2019, Hawthorne filed a writ application to the Louisiana Fourth Circuit Court of Appeal.[22]   On March 3, 2020, that court denied Hawthorne's writ application and found that the state district court did not err in rejecting Hawthorne's allegations that he received ineffective assistance of counsel.[23]

On September 29, 2020, the Louisiana Supreme Court denied Hawthorne's writ application.[24]   The Court found that Hawthorne failed to show that he received ineffective assistance of counsel under the standard of *Strickland v. Washington*, 466 U.S. 668 (1984).[25]

Hawthorne filed an application for post-conviction relief claiming the non-unanimous jury verdict was unconstitutional under *Ramos v. Louisiana*[26] on November 6, 2020.[27]

## II.    FEDERAL HABEAS PETITION

On November 2, 2020, Hawthorne filed a petition for federal habeas corpus relief under 28 U.S.C. § 2254 and challenged his current custody.[28]   Hawthorne asserts the following claims:

(1) insufficient evidence supported his convictions;

(2) the trial court erred in admitting Hawthorne's statement to Jupiter;

(3) the trial court erred in admitting evidence that Hawthorne disposed of a handgun as he fled from police;

---

[20] *Id.* at 3.

[21] *Id.*

[22] St. R. Vol. 9 of 9, 4th Cir. Writ Application, 20 K 0106, 3/28/19 (dated 3/27/19).

[23] St. R. Vol. 9 of 9, La. App. 4th Cir. Order, 2020-K-0106, 3/3/20.

[24] *Hawthorne*, 301 So. 3d at 1158; St. R. Vol. 9 of 9, La. Sup. Ct. Order, 2020-KH-00586, 9/29/20.

[25] *Id.*; St. R. Vol. 9 of 9, La. Sup. Ct. Order, 2020-KH-00586, 9/29/20.

[26] 140 S. Ct. 1390 (2020).

[27] *See* ECF No. 16, at 2.

[28] ECF No. 5.

(4) his right to a fair and impartial trial was violated when the victim was allowed to remain in the courtroom, and his trial counsel was ineffective in failing to object;

(5) the prosecutor committed misconduct during opening statements and closing arguments, and his counsel was ineffective in failing to object;

(6) the trial court erred in allowing him to be convicted by a non-unanimous verdict, and his counsel was ineffective in failing to object.[29]

The State filed a response in opposition to Hawthorne's petition and asserted that it was untimely filed, but waived the statute of limitation defense.[30] The State conceded that Hawthorne's claims were exhausted, but noted that Hawthorne had filed in the state district court a second application for post-conviction relief challenging the non-unanimity of his conviction.[31] The State claimed that a stay or dismissal of the petition was appropriate to allow Hawthorne to exhaust his *Ramos* claim.[32] The State asserts that Hawthorne's claims are either not cognizable on habeas review or are meritless.[33]

Hawthorne filed a motion to stay the case pending the outcome of his second application for post-conviction relief.[34] The Court, while finding that Hawthorne's petition did not include a claim or argument pursuant to *Ramos* and was not a mixed petition, granted the stay on May 14, 2021, to allow Hawthorne to exhaust his *Ramos* claim.[35] After the Louisiana Supreme Court held that the jury-unanimity rule from *Ramos* is not retroactive on collateral review,[36] Hawthorne

---

[29] ECF No. 5, at 2-3, 4-5; ECF No. 5-1, at 1-2.
[30] ECF No. 15, at 5-7.
[31] *Id.* at 7-8.
[32] *Id.* at 8.
[33] *Id.* at 9-20.
[34] ECF No. 16.
[35] ECF No. 17.
[36] *State v. Reddick*, 351 So. 3d 273 (La. 10/21/22).

moved to reopen the case on December 2, 2022.[37]  This Court granted the motion and lifted the stay on December 5, 2022.[38]

Hawthorne filed a reply to the State's response.[39]  Hawthorne asserts that, regardless of the State's waiver, his habeas petition was timely filed.[40]

On March 23, 2023, this Court ordered the State to supplement the record with a copy of closing arguments and jury instructions.[41]  Thereafter, the State electronically filed transcripts of closing arguments and the jury charges.[42]

## III.    LAW AND ANALYSIS

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. No. 104-132, 110 Stat. 1214, comprehensively revised federal habeas corpus legislation, including 28 U.S.C. § 2254.  The AEDPA went into effect on April 24, 1996,[43] and applies to habeas petitions filed after that date.[44]  The AEDPA therefore applies to Hawthorne's petition filed on November 2, 2020.[45]

---

[37] ECF No. 23.

[38] ECF No. 24.

[39] ECF No. 20-1, at 2-5.

[40] *Id.* at 2-3.

[41] ECF No. 25.

[42] ECF Nos. 32 and 34.

[43] The AEDPA was signed into law on that date and did not specify an effective date for its non-capital habeas corpus amendments.  Absent legislative intent to the contrary, statutes become effective at the moment they are signed into law.  *United States v. Sherrod*, 964 F.2d 1501, 1505 (5th Cir. 1992).

[44] *Flanagan v. Johnson*, 154 F.3d 196, 198 (5th Cir. 1998) (citing *Lindh v. Murphy*, 521 U.S. 320 (1997)).

[45] The Fifth Circuit has recognized that a "mailbox rule" applies to pleadings, including habeas corpus petitions filed after the effective date of the AEDPA, submitted to federal courts by prisoners acting *pro se*. Under this rule, the date when prison officials receive the pleading from the inmate for delivery to the court is considered the time of filing for limitations purposes.  *Coleman v. Johnson*, 184 F.3d 398, 401 (5th Cir. 1999); *Spotville v. Cain*, 149 F.3d 374, 378 (5th Cir. 1998); *Cooper v. Brookshire*, 70 F.3d 377, 379 (5th Cir. 1995).  Hawthorne dated his signature November 2, 2020.  ECF No. 5, at 6; No. 5-1, at 55.

## A.    <u>Preliminary Considerations</u>

The threshold questions in habeas review under the amended statute are whether the petition is timely and whether petitioner's claims were adjudicated on the merits in state court. In other words, has the petitioner exhausted state court remedies and is the petitioner in "procedural default" on a claim.[46] The State claims that Hawthorne's federal petition was not timely filed under the AEDPA, although it waives the statute of limitations defense.[47] The State's conclusion as to timeliness is incorrect.

### 1.    <u>AEDPA Statute of Limitations</u>

The AEDPA requires that a § 2254 petition must ordinarily be filed within one year of the date the conviction became final.[48] Hawthorne's conviction was final on August 25, 2017, when

---

[46] *Nobles v. Johnson*, 127 F.3d 409, 419-20 (5th Cir. 1997) (citing 28 U.S.C. § 2254(b), (c)).

[47] ECF No. 15, at 5-6.

[48] *Duncan v. Walker*, 533 U.S. 167, 179-80 (2001). The statute of limitations provision of the AEDPA in 28 U.S.C. § 2244(d) provides for other triggers:

> (1) A 1-year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court. The limitation period shall run from the latest of—
>
> A. the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;
>
> B. the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State actions;
>
> C. the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or
>
> D. the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.
>
> (2) The time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection.

Sections (d)(1)(B), (C) and (D) do not apply here.

he did not file an application for writ of certiorari with the United States Supreme Court within ninety (90) days after the Louisiana Supreme Court denied his post-appeal writ application on May 26, 2017.  Applying § 2244 literally, Hawthorne had one year from finality of his conviction, or until August 27, 2018,[49] to file his federal habeas corpus petition.  Hawthorne did not file his federal habeas corpus petition within this one-year period.

Accordingly, his petition is untimely, unless the one-year statute of limitations was interrupted or otherwise tolled under one of the two ways recognized in the applicable law: statutory tolling or equitable tolling.

Regarding the tolling of the statute of limitations, the AEDPA expressly provides that "[t]he time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection."[50]  After three hundred and twenty-one days (321) days, Hawthorne filed his application for post-conviction relief on July 12, 2018, and it remained pending through completion of review on September 29, 2020, when the Louisiana Supreme Court denied his related writ application.  At that time, Hawthorne had forty-four (44) days remaining of the one-year limitations period at this point, or until November 10, 2020, in which to file his habeas petition.  Hawthorne filed his federal petition on November 2, 2020.  His petition, therefore, was timely filed within the one-year AEDPA limitations period.

---

[49] The final day fell on Saturday, August 25, 2018, causing the final day to fall on the next business day, Monday, August 27, 2018.  FED. R. CIV. PROC. 6(a)(1)(C) ("if the last day is a Saturday, Sunday, or legal holiday, the period continues to run until the end of the next day that is not a Saturday, Sunday, or legal holiday.").

[50] 28 U.S.C. § 2244(d)(2).

### B.    Standards of a Merits Review of the Claims

Sections 2254(d)(1) and (2) contain revised standards of review for questions of fact, questions of law, and mixed questions of fact and law in federal habeas corpus proceedings.[51] Determinations of questions of fact by the state court are "presumed to be correct . . . and we will give deference to the state court's decision unless it 'was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.'"[52]  The statute also codifies the "presumption of correctness" that attaches to state court findings of fact and the "clear and convincing evidence" burden placed on a petitioner who attempts to overcome that presumption.  28 U.S.C. § 2254(e)(1).

A state court's determination of questions of law and mixed questions of law and fact are reviewed under 28 U.S.C. § 2254(d)(1).  The determination receives deference, unless the state court's decision "'was contrary to, or involved an unreasonable application of, clearly established [Supreme Court precedent.]'"[53]  The United States Supreme Court has clarified the § 2254(d)(1) standard as follows:

> Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts.  Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.[54]

---

[51] *Nobles*, 127 F.3d at 419-20 (citing 28 U.S.C. § 2254(b) and (c)).

[52] *Hill v. Johnson*, 210 F.3d 481, 485 (5th Cir. 2000) (quoting 28 U.S.C. § 2254(d)(2)).

[53] *Penry v. Johnson*, 215 F.3d 504, 507 (5th Cir. 2000) (brackets in original) (quoting *Miller v. Johnson*, 200 F.3d 274, 280-81 (5th Cir. 2000)), *aff'd in part, rev'd in part on other grounds*, 532 U.S. 782 (2001); *Hill*, 210 F.3d at 485.

[54] *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000); *Penry*, 532 U.S. at 792-93 (2001) (citing *Williams*, 529 U.S. at 405-06, 407-08); *Hill*, 210 F.3d at 485.

The "critical point" in determining the Supreme Court rule to be applied "is that relief is available under § 2254(d)(1)'s unreasonable-application clause if, and only if, it is so obvious that a clearly established rule applies to a given set of facts that there could be no 'fairminded disagreement' on the question."[55]  "Thus, 'if a habeas court must extend a rationale before it can apply to the facts at hand,' then by definition the rationale was not 'clearly established at the time of the state-court decision.'"[56]

"'[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the state-court decision applied [a Supreme Court case] incorrectly.'"[57]  Rather, under the "unreasonable application" standard, "the only question for a federal habeas court is whether the state court's determination is objectively unreasonable."[58]  The burden is on the petitioner to show that the state court applied the precedent to the facts of his case in an objectively unreasonable manner.[59]

## IV.    HAWTHORNE'S SPECIFIC CLAIMS[60]

### A.    Claim One: Insufficient Evidence

Hawthorne alleges that there was insufficient evidence to support the verdicts.  He claims that the victim's testimony was uncorroborated and conflicting and that the State failed to prove

---

[55] *White v. Woodall*, 572 U.S. 415, 427 (2014) (citing *Harrington v. Richter*, 562 U.S. 86, 103 (2011); *Knowles v. Mirzayance*, 556 U.S. 111, 122 (2009)); *Shoop v. Hill*, 139 S. Ct. 504, 506 (2019) (quoting *Harrington*, 562 U.S. at 103).

[56] *White*, 572 U.S. at 426 (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 666 (2004)); *Shoop*, 139 S. Ct. at 509 (habeas courts must rely "strictly on legal rules that were clearly established in the decisions of this Court at the relevant time.")

[57] *Price v. Vincent*, 538 U.S. 634, 641 (2003) (brackets in original) (quoting *Woodford v. Visciotti*, 537 U.S. 19, 24-25 (2002) (citations omitted)).

[58] *Neal v. Puckett*, 286 F.3d 230, 246 (5th Cir. 2002).

[59] *Price*, 538 U.S. at 641 (*quoting Woodford*, 537 U.S. at 24-25); *Wright v. Quarterman*, 470 F.3d 581, 585 (5th Cir. 2006).

[60] For ease of analysis, some of Hawthorne's claims are discussed in a different order than listed in the petition.

lack of consent or present any evidence of an armed robbery.

The State responds that there was ample evidence to support the verdicts and that the state courts' rejection of Hawthorne's sufficiency of the evidence claim was not contrary to or an unreasonable application of Supreme Court precedent.

On direct appeal, Hawthorne raised insufficiency of the evidence claims. In the last reasoned opinion, the Louisiana Fourth Circuit found:

> In this assignment of error, Defendant argues the evidence was insufficient to support his convictions.
>
> Defendant admits he had sex with Victim, and that the sexual activity occurred in his car. He claims, however, that the sexual activity was consensual. He challenges Victim's account based on her initial failure to report the rape on the 911 call; claims that her statements to the police, the SANE Nurse, and at trial were inconsistent; challenges the lack of corroborating evidence that a rape occurred; and questions Victim's sobriety at the time of the incident. Further, he contends the State failed to prove he was guilty of armed robbery because the State failed to show he used force or intimidation, or was armed with a dangerous weapon when he dropped Victim off in a parking lot and left with her property.
>
> The Louisiana Supreme Court has recently explained:
>
>> In reviewing the sufficiency of the evidence to support a conviction, this court has recognized that an appellate court in Louisiana is controlled by the standard enunciated by the United States Supreme Court in *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560, *rehearing denied*, 444 U.S. 890, 100 S.Ct. 195, 62 L.Ed.2d 126 (1979). *State v. Tate*, 01-1658 (La. 5/20/03), 851 So.2d 921, 928. Under this standard, an appellate court "must determine that the evidence, viewed in the light most favorable to the prosecution, was sufficient to convince a rational trier of fact that all of the elements of the crime had been proved beyond a reasonable doubt." *Tate*, 851 So.2d at 928. In applying this standard, a reviewing court is not permitted to second guess the rational credibility determinations of the fact finder at trial, nor is a reviewing court required to consider the rationality of the thought processes employed by a particular fact finder in reaching a verdict. *State v. Marshall*, 04–3139 (La.11/29/06), 943 So.2d 362, 367. It is not the function of an appellate court to assess credibility or reweigh the evidence. State v. Stowe, 635 So.2d 168, 171 (La.1994).

*State v. Kelly*, 2015–0484, pp. 3-4 (La. 6/29/16), —— So.3d ——, 2016 WL 3546432, at *2.

Additionally, "[t]he testimony of a single witness, if believed by the trier of fact, is in most cases sufficient to support a conviction." *State v. Watkins*, 2013–1248, p. 14 (La. App. 4 Cir. 8/6/14), 146 So.3d 294, 303 (citing *State v. Wells*, 2010–1338, p. 5 (La. App. 4 Cir. 3/30/11), 64 So.3d 303, 306). Conflicting testimony as to factual matters is a question of weight of the evidence, not sufficiency. *State v. Jones*, 537 So.2d 1244, 1249 (La. App. 4 Cir.1989).

"When circumstantial evidence is used to prove the commission of the offense, La. R.S. 15:438 requires that 'assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence.'" *State v. Neal*, 2000–0674, p. 9 (La. 6/29/01), 796 So.2d 649, 657 (quoting La. R.S. 15:438). Ultimately, all evidence, both direct and circumstantial must be sufficient under *Jackson* to prove guilt beyond a reasonable doubt to a rational jury. *Id.* (citing *State v. Rosiere*, 488 So.2d 965, 968 (La. 1986)).

Defendant was convicted of the crimes of aggravated rape, aggravated kidnapping and armed robbery.

At the time of the commission of the crime, La. R.S. 14:42 defined aggravated rape, in pertinent part, as follows:

A. Aggravated rape is a rape committed upon a person sixty-five years of age or older or where the anal, oral, or vaginal sexual intercourse is deemed to be without lawful consent of the victim because it is committed under any one or more of the following circumstances:

(1) When the victim resists the act to the utmost, but whose resistance is overcome by force.

(2) When the victim is prevented from resisting the act by threats of great and immediate bodily harm, accompanied by apparent power of execution.

(3) When the victim is prevented from resisting the act because the offender is armed with a dangerous weapon.

La. R.S. 14:44 defines the offense of aggravated kidnapping, in pertinent part, as follows:

Aggravated kidnapping is the doing of any of the following acts with the intent thereby to force the victim, or some other person, to give up anything of apparent present or prospective value, or to grant any advantage or immunity, in order to secure a release of the person under the offender's actual or apparent control:

(1) The forcible seizing and carrying of any person from one place to another; or

(2) The enticing or persuading of any person to go from one place to another; or

(3) The imprisoning or forcible secreting of any person.

La. R.S. 14:64 defines armed robbery as follows:

A. Armed robbery is the taking of anything of value belonging to another from the person of another or that is in the immediate control of another, by use of force or intimidation, while armed with a dangerous weapon.

In this case, Victim testified that Defendant forced her to remain in his vehicle by brandishing a gun and threatening her "that things could get worse" if she did not acquiesce to his demands. He then drove to a secluded area, ordered her to get into the back seat of his vehicle, and raped her both orally and vaginally. After the attack, Defendant drove her to a parking lot, ordered her to get out of the vehicle, and drove away with her purse, which contained her bank card.

Defendant's assertion that Victim failed to initially report a rape during the 911 call was explained by Victim's testimony at trial that she was in shock, horrified and embarrassed by what had been done to her at the time she made the call. Furthermore, contrary to Defendant's insistence that Victim gave inconsistent reports to the police, former NOPD Officer Ferreira and Sgt. Welch, the first responders to Victim's 911 call, and SANE Nurse all testified consistently regarding how the rape was reported to them by Victim and that Victim told them she was, in fact, raped.

As for Defendant's argument in his *pro se* brief that Victim was intoxicated during and immediately after the incident, neither Officer Ferreira, Sgt. Welch nor SANE Nurse saw any signs to indicate that Victim was drunk or impaired by alcohol consumption. The jury obviously credited the State's evidence over Defendant's assertion on this issue.

Viewing all of the evidence in the light most favorable to the prosecution, any rational trier of fact could have found beyond a reasonable doubt that Defendant (1) orally and vaginally raped Victim, where Victim was prevented from resisting the acts by (a) threats of great and immediate bodily harm accompanied by apparent power of execution and/or (b) while armed with a dangerous weapon (aggravated rape); (2) forcibly imprisoned Victim in his vehicle at gunpoint where he vaginally raped her, with her submitting in order to survive and ultimately be released (aggravated kidnapping); and (3) took Victim's property (purse and its contents) by force or intimidation while armed with a gun (armed robbery). The jury accredited Victim's account of the crimes over Defendant's testimony and this Court must

accept the jury's credibility determination. *Kelly*, 2015–0484 at pp. 3–4, 2016 WL 3546432, at *2. Accordingly, we find that the evidence offered by the State at trial proved beyond a reasonable doubt that Defendant was guilty of the crimes of aggravated rape, aggravated kidnapping, and armed robbery. There is no merit to Defendant's insufficiency of the evidence argument.[61]

Hawthorne sought review of the Louisiana Fourth Circuit decision, and the Louisiana Supreme Court denied writs without reasons.[62]

A federal habeas court addressing an insufficiency of the evidence claim must determine, after viewing the evidence in the light most favorable to the prosecution, whether a rational trier of fact could have found that the essential elements of the crime were proven beyond a reasonable doubt.[63] As the Supreme Court explained:

> [T]his inquiry does not require a court to ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt. Instead, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.[64]

Moreover, because the state court's decision applying the already deferential *Jackson* standard must be assessed here under the strict and narrow standards of review mandated by the AEDPA, the standard to be applied by this Court is in fact "twice-deferential."[65]

To determine whether commission of a crime is adequately supported by the record, the court must review the substantive elements of the crime as defined by state law.[66] The court's consideration of the sufficiency of the evidence extends only to what was presented at trial.[67] A

---

[61] *Hawthorne*, 2016 WL 4211361, at *5-7 (footnotes omitted); St. R. Vol. 7 of 9, 4th Cir. Opinion, 2015-KA-0675, at 9-13, 8/10/16 (footnotes omitted).

[62] *Hawthorne*, 221 So. 3d at 855; St. R. Vol. 7 of 9, La. Sup. Ct. Order, 2016-KO-1676, 5/26/17.

[63] *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *Williams v. Cain*, 408 F. App'x 817, 821 (5th Cir. 2011); *Perez v. Cain*, 529 F.3d 588, 594 (5th Cir. 2008).

[64] *Jackson*, 443 U.S. at 319 (emphasis in original) (internal quotation marks and citations omitted).

[65] *Parker v. Matthews*, 567 U.S. 37, 43 (2012); *see also Coleman*, 566 U.S. at 651.

[66] *Perez*, 529 F.3d at 594 (citing *Jackson*, 443 U. S. at 324 n.16).

[67] *See McDaniel v. Brown*, 558 U.S. 120, 131, 134 (2010) (recognizing that a reviewing court must consider the trial evidence as a whole under *Jackson*); *Johnson v. Cain*, 347 F. App'x 89, 91 (5th Cir. 2009) (*Jackson*

federal habeas court is not authorized to substitute its interpretation of the evidence or its view of the credibility of witnesses in place of the fact-finder.[68]  Thus, review of the sufficiency of the evidence does not include review of the weight of the evidence or the credibility of the witnesses, because those determinations are the exclusive province of the jury.[69]  All credibility choices and conflicting inferences must be resolved in favor of the verdict.[70]  Again, "[t]he *Jackson* inquiry 'does not focus on whether the trier of fact made the correct guilt or innocence determination, but rather whether it made a rational decision to convict or acquit.'"[71]

A claim of insufficient evidence presents a mixed question of law and fact.[72]  Therefore, this court must examine whether the state courts' denial of relief was contrary to or an unreasonable application of United States Supreme Court precedent.

Hawthorne was charged and convicted of aggravated rape, aggravated kidnapping, and armed robbery.  At the time of the offenses, aggravated rape was defined as oral or vaginal sexual intercourse without the lawful consent of the victim where "the victim is prevented from resisting the act because the offender is armed with a dangerous weapon."[73]  Under Louisiana law, for a rape to occur, "[e]mission is not necessary, and any sexual penetration . . . however slight, is sufficient to complete the crime."[74]  Oral sexual intercourse is defined in pertinent part as the

---

standard relies "upon the record evidence adduced at the trial.") (quoting *Jackson*, 443 U.S. at 324).

[68] *Weeks v. Scott*, 55 F.3d 1059, 1062 (5th Cir. 1995); *Alexander v. McCotter*, 775 F.2d 595, 598 (5th Cir. 1985).

[69] *United States v. Young*, 107 F. App'x 442, 443 (5th Cir. 2004) (citing *United States v. Garcia*, 995 F.2d 556, 561 (5th Cir. 1993)); *see Jackson*, 443 U.S. at 319 (noting that it is the jury's responsibility "to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts").

[70] *Ramirez v. Dretke*, 398 F.3d 691, 695 (5th Cir. 2005).

[71] *Santellan v. Cockrell*, 271 F.3d 190, 193 (5th Cir. 2001) (quoting *Herrera v. Collins*, 506 U.S. 390, 402 (1993)).

[72] *Perez*, 529 F.3d at 594; *Maes v. Thomas*, 46 F.3d 979, 988 (10th Cir. 1995).

[73] LA. REV. STAT. § 14:42(A)(3).

[74] LA. REV. STAT. § 14:41(B).

"touching of the anus or genitals of the victim by the offender using the mouth or tongue of the offender" or as the "touching the anus or genitals of the offender by the victim using the mouth or tongue of the victim."[75]

In Louisiana, the testimony of a sexual assault victim is sufficient to support a requisite factual finding.[76] Significantly, the victim's testimony alone is sufficient to establish the elements of the offense, even when the State does not introduce medical, scientific, or physical evidence to prove commission of the offense by the defendant.[77]

Louisiana law defines aggravated kidnapping as follows:

> Aggravated kidnapping is the doing of any of the following acts with the intent thereby to force the victim, or some other person, to give up anything of apparent present or prospective value, or to grant any advantage or immunity, in order to secure a release of the person under the offender's actual or apparent control:
>
> (1) The forcible seizing and carrying of any person from one place to another; or
>
> (2) The enticing or persuading of any person to go from one place to another; or
>
> (3) The imprisoning or forcible secreting of any person.[78]

"Specific intent" under Louisiana law is defined as "that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act."[79] Specific intent is a question to be resolved by the fact finder, and may be inferred from the circumstances of the transaction.[80]

---

[75] LA. REV. STAT. § 14:41(C)(1), (2).
[76] *State v. Demery*, 165 So. 3d 1175, 1180 (La. App. 2d Cir. 2015).
[77] *State v. Ponsell*, 766 So. 2d 678, 682 (La. App. 2d Cir. 2000); *State v. Johnson*, 706 So. 2d 468, 475 (La. App. 4th Cir. 1997).
[78] LA. REV. STAT. § 14:44.
[79] LA. REV. STAT. § 14:10.
[80] *State v. Henderson*, 762 So. 2d 747, 751 (La. App. 1st Cir. 2000).

Armed robbery is defined as "the taking of anything of value belonging to another from the person of another or that is in the immediate control of another, by use of force or intimidation, while armed with a dangerous weapon."[81] The "force or intimidation" in an armed robbery "may be applied at any time in the course of the crime in order to complete the offense."[82] Thus, an armed robbery is committed "not only if the perpetrator uses force or intimidation to take possession of the property, but also if force or intimidation is used to retain possession immediately after the taking, or to carry away the property, or to facilitate escape."[83]

To convict Hawthorne of armed robbery, the State was required to prove beyond a reasonable doubt all elements of the statute.[84] Under the Louisiana criminal code, anything of value "must be given the broadest possible construction, including any conceivable thing of the slightest value."[85] A dangerous weapon is defined broadly as "any gas, liquid, or other substance or instrumentality, which in the manner used, is calculated or likely to produce death or great bodily harm."[86] Louisiana law recognizes that a gun is a dangerous weapon.[87]

Under Louisiana law, armed robbery is a general intent crime.[88] "General criminal intent is present whenever there is specific intent, and also when the circumstances indicate that the offender, in the ordinary course of human experience, must have adverted to the prescribed criminal consequences as reasonably certain to result from his act or failure to act."[89] General

---

[81] LA. REV. STAT. § 14:64(A); *State v. Thomas*, 13 So. 3d 603, 606 (La. App. 5th Cir. 2009).

[82] *State v. Walker*, 681 So. 2d 1023, 1028 (La. App. 2d Cir. 1996).

[83] *State v. Meyers*, 620 So. 2d 1160, 1163 (La. 1993) (finding that defendant committed a robbery when he used force or intimidation to retain possession of money he had just taken from a cash register).

[84] *State v. Garner*, 532 So. 2d 429, 434 (La. App. 1st Cir. 1988).

[85] LA. REV. STAT. § 14:2(A)(2).

[86] LA. REV. STAT. § 14:2(A)(3).

[87] LA. REV. STAT. § 14:64(A); *State v. Thomas*, 13 So. 3d 603, 606 (La. App. 5th Cir. 2009).

[88] *State v. Smith*, 23 So. 3d 291, 297-98 (La. 2009); *State v. Payne*, 540 So. 2d 520, 523-524 (La. App. 1st Cir. 1989).

[89] LA. REV. STAT. § 14:10(2).

intent "is shown by the very doing of the acts which have been declared criminal."[90]  Under Louisiana law, intent need not be proven directly but may be inferred from the actions of the defendant and the circumstances surrounding those actions.[91]

At trial, the State presented the testimony of Officer Viviana Ferreira who responded to the Guste Apartments.[92]  She encountered the victim who was crying, and appeared disheveled, and distraught.[93]  Officer Ferreira did not suspect that the victim was intoxicated, rather she described the victim as "remarkably coherent."[94]  The victim told Ferreira that she had gone to Mardi Gras with friends, but at some point she became separated from them.[95]  The victim told Ferreira that she was looking for a cab when a gray or silver vehicle, which she believed to be a taxi, stopped.[96]  The male driver said he could take her to her hotel, so the victim got in the front seat of his vehicle.[97]  Eventually, the victim became nervous when she felt that the drive was taking longer than it should, and she asked the driver to take her to her hotel.[98]  The driver pulled over in an unknown area that was dark and unlit, and asked the victim for sex.[99]  The victim told Ferreira that she declined, but the driver brandished a silver firearm and told her to get in the back seat and take off her clothes.[100]  The victim began crying, and again said "no," but the driver told her things could get a lot worse.[101]  The victim complied, and the man followed her into the back seat where

---

[90] *State v. Oliphant*, 113 So. 3d 165, 172 (La. 2013) (citation omitted).
[91] *State v. Sharlhorne*, 554 So. 2d 1317, 1321 (La. App. 1st Cir. 1989); *State v. Tate*, 851 So. 2d 921, 930 (La. 2003) (citing *State v. Brooks*, 505 So. 2d 714, 717 (La. 1987)).
[92] St. R. Vol. 6 of 9 at 62, Trial Tr., 12/1-2/14.
[93] *Id.* at 63.
[94] *Id.* at 65.
[95] *Id.* at 69, 73.
[96] *Id.*
[97] *Id.* at 69.
[98] *Id.* at 69, 74.
[99] *Id.* at 69.
[100] *Id.* at 69, 74-75.
[101] *Id.* at 69.

he vaginally raped her.[102]  After he finished, the victim got dressed, and the perpetrator drove to an unknown location, and told her to get out.[103]  The victim reported to Ferreira that she got out of the car and was attempting to retrieve her shoes and purse when the perpetrator drove off, ejecting her from the vehicle.[104]  The victim walked to the Guste Apartments and called 911.[105]  At no time during the interview did Officer Ferreira believe that the victim was fabricating any part of the story.[106]  Officer Ferreira transported the victim to the hospital.[107]

The jury heard of the testimony of Sergeant Richard Welch who responded to a call to investigate an aggravated rape.[108]  Welch recalled that the victim was barefoot, appeared disheveled, upset, and visibly shaken.[109]  Sergeant Welch interviewed the victim, who reported that she was raped.[110]  Sergeant Welch recalled that the victim admitted that she had been drinking, but he admitted that he did not think she appeared intoxicated.[111]  Welch testified that, while Officer Ferreira took the victim to the hospital, Welch went to the hotel and found the victim's friends and brought them to the hospital.[112]

The parties stipulated that a sexual assault examination was done of the victim with two cervical swabs, two external genitalia swabs, and two rectal swabs.[113]  Hawthorne's DNA was

---

[102] *Id.* at 70.
[103] *Id.*
[104] *Id.*
[105] *Id.* at 70.
[106] *Id.* at 70-72.
[107] *Id.* at 71.
[108] *Id.* at 77.
[109] *Id.* at 78-79.
[110] *Id.* at 81.
[111] *Id.* at 81-82.
[112] *Id.* at 83.
[113] *Id.* at 85.

found on four of the swabs.[114]  Additionally, Hawthorne's seminal fluid was found inside of the victim.[115]

Jean Holland, a sexual assault nurse examiner, testified that she examined the victim and recalled that the victim's clothes were disheveled, and her hair was messy.[116]  She described the victim, who was crying, as very emotional, tearful, fearful, and distraught.[117]  The victim told Holland that she was looking for a taxi when a man pulled over.[118]  She asked if he could take her to her hotel, and he asked if she had cash, and offered to take her.[119]  Instead, he drove around for a bit before pulling over into a neighborhood, and then asked her for sex.[120]  The victim told Holland that the perpetrator pulled out a gun and forced the victim to get into the back seat and disrobe.[121]  The perpetrator got into the back seat with the victim, who was frantic, crying, and begging him to take her to the hotel.[122]  The perpetrator put his mouth on her vulva area, and inserted his penis into her vagina.[123]  When he finished, he got back into the front seat, and drove the victim near an unknown hotel, and let her out.[124]  The perpetrator drove away as the victim was attempting to get her purse out of the vehicle.[125]  The victim walked to a building, and reported the incident to the security officer who called the police.[126]  Holland noted that the victim had

---

[114] *Id.*

[115] *Id.*

[116] *Id.* at 108

[117] *Id.* at 108, 112.

[118] *Id.* at 111.

[119] *Id.*

[120] *Id.*

[121] *Id.*

[122] *Id.*

[123] *Id.*

[124] *Id.*

[125] *Id.*

[126] *Id.*

bruising to both hands and knees.[127]  She had an abrasion to her hip, and one on her left lower abdomen.[128]  The victim had a green sticky substance on the back of one of her thighs, which Holland suspected was possibly gum.[129]  Holland testified that the victim's physical injuries were consistent with what the victim had reported happened to her.[130]

Holland performed a pelvic exam on the victim.[131]  She explained that in over fifty percent of her sexual assault cases, there is no sign of obvious trauma.[132]  She swabbed the victim's anus, vagina and cervix for DNA.[133]  Holland explained a toxicology screen was not done because the victim did not appear intoxicated, and she was coherent and totally ambulatory.[134]

The victim testified that she traveled from Dallas, Texas, with friends to New Orleans to attend Mardi Gras.[135]  She and her friends spent the day going to bars and drinking.[136]  Around 2:30 a.m., she became separated from her friends and, because she felt like she was starting to get drunk, she decided to find a cab to take her back to her hotel.[137]  She walked around waving her hand in an attempt to flag down a taxi.[138]  Her cell phone was water damaged and did not work, but she had her debit card and some cash to pay for a cab.[139]  At some point she flagged down a car, which she thought was a car service, and asked the perpetrator, who she identified as

---

[127] *Id.* at 112, 114.
[128] *Id.*
[129] *Id.* at 112.
[130] *Id.* at 115.
[131] *Id.* at 116.
[132] *Id.* at 116-17.
[133] *Id.* at 120-21.
[134] *Id.* at 125-26.
[135] *Id.* at 132-33, 135, 146-47.
[136] *Id.* at 135, 147.
[137] *Id.* at 135-36, 147-49.
[138] *Id.* at 136.
[139] *Id.*

Hawthorne, if he could take her to the Holiday Inn Superdome.[140]  After Hawthorne confirmed that she had cash, he allowed her to get into the car.[141]  She sat in the front passenger seat.[142]

The victim testified that she became concerned when it felt like they had been driving for a really long time.[143]  Hawthorne stopped in a neighborhood and asked her for sex.[144]  The victim declined, and she begged and pleaded with him to drive her to the hotel.[145]  Hawthorne told her that things could get a whole lot worse, showed her a silver handgun, and told her to get into the back seat and take off her clothes.[146]  After the victim disrobed, Hawthorne performed oral and then vaginal sex on her.[147]  The victim explained that he put his mouth on her vagina, and put his penis in her vagina.[148]  The victim recalled that she was crying and repeatedly asked him to stop.[149]  Eventually, Hawthorne got back into the front seat and began driving.[150]  He stopped in a parking lot, and told her to get out of the car.[151]  The victim exited the car and reached into the back seat to get her shoes and purse when he drove off, causing her to fall out of the car.[152]  She ran to a large building and told the security guard that she had just been robbed and needed to call the police.[153]  The victim admitted that she did not tell the 911 operator that she had been raped, but explained that she was in shock, embarrassed and horrified, and did not plan on admitting that she

---

[140] *Id.* at 137, 150-51.
[141] *Id.* at 137, 152.
[142] *Id.* at 137, 154.
[143] *Id.* at 137-38.
[144] *Id.* at 138, 158, 164.
[145] *Id.*
[146] *Id.* at 138-39, 163-64.
[147] *Id.* at 139-40.
[148] *Id.* at 140.
[149] *Id.*
[150] *Id.* at 140, 160.
[151] *Id.* at 141, 165.
[152] *Id.* at 141, 166.
[153] *Id.* at 141, 165.

had been raped.[154]   When she spoke to the police officers, she told them everything that had

happened, including that she had been sexually assaulted.[155]   The female officer took her to the

hospital.[156]

The victim recalled that a nurse examined her, and the victim gave her a statement.[157]   The

victim testified that the bruise on her hip was the result of her falling out of the car when she

attempted to get her shoes and her purse.[158]   The victim met with a sex crimes detective and gave

a statement.[159]   She flew back home to Dallas later that day.[160]   A few days later, she learned that

her credit card that was in the purse that she had in Hawthorne's car had been used.[161]   The victim

confirmed that Hawthorne forced her to have sex with him without her consent.[162]

Sharon Jupiter, the mother of Hawthorne's older child, testified that a police officer came

to her residence looking for Hawthorne.[163]   Jupiter told the officer that she and Hawthorne planned

on meeting so he could retrieve their son from her.[164]   The officer asked her to call Hawthorne to

get him to come to her house so that he could be arrested.[165]   Hawthorne, who had seen the police

car, called Jupiter and told her that he was wanted, and asked if they could meet at the park.[166]

Jupiter and their son met Hawthorne about a block from the park.[167]   Hawthorne pulled a black

---

[154] *Id.* at 142.
[155] *Id.* at 143, 165-66.
[156] *Id.* at 143.
[157] *Id.* at 143-44, 167.
[158] *Id.* at 144, 166.
[159] *Id.* at 144.
[160] *Id.*
[161] *Id.* at 144-45.
[162] *Id.* at 145.
[163] *Id.* at 169-70, 174.
[164] *Id.* at 170.
[165] *Id.*
[166] *Id.* at 170, 174.
[167] *Id.* at 171, 174.

and silver gun out of his pocket and showed it to Jupiter.[168]   They walked to the park, and eventually the police arrived.[169]   Hawthorne ran, and Jupiter told the police to be careful because he was armed, and a chase ensued.[170]

Officer Devin Joseph of the Violent Offender Warrant Squad of the New Orleans Police Department testified that he participated in Hawthorne's arrest on October 7, 2013.[171]   The squad positioned themselves around that park.[172]   Hawthorne fled when he observed a marked police car pull up.[173]   Joseph heard a female say, "be careful.  He has a gun."[174]   Officer Joseph observed Hawthorne holding a bulge in his right waistband as he fled.[175]   Joseph, who was chasing Hawthorne, lost sight of him for three or four seconds when Hawthorne ran behind an abandoned house next to an empty lot.[176]   When Hawthorne reappeared, Joseph noticed that he ran freely with both hands, and Joseph no longer saw the bulge.[177]   Joseph radioed the other officers that Hawthorne threw the gun in the empty lot, and continued chasing him.[178]   According to Joseph, Hawthorne lost his footing and fell to the ground.[179]   Joseph pointed his taser at Hawthorne and ordered him to lay on his stomach with his hands on his back.[180]   After placing him under arrest,

---

[168] *Id.* at 171, 175.
[169] *Id.* at 171, 175.
[170] *Id.* at 172, 175-76.
[171] *Id.* at 177-79.
[172] *Id.* at 179-80, 184.
[173] *Id.* at 180, 182.
[174] *Id.* at 180, 186, 189.
[175] *Id.* at 180, 185.
[176] *Id.* at 180, 185.
[177] *Id.* at 181.
[178] *Id.*
[179] *Id.*
[180] *Id.*

Joseph went to the area where he had lost sight of Hawthorne and located a loaded gun in the grass.[181]

Detective Vernon Haynes testified that he investigated a case involving the victim on February 9, 2013.[182]  According to Haynes, the victim appeared to be intoxicated at the time of the first interview.[183]  He explained that he was unable to ascertain where she first came into contact with Hawthorne nor where she was assaulted.[184]  The victim described the perpetrator as a thin African American male in his twenties with a dark complexion.[185]  He wore a fisherman style hat with his hair protruding underneath and a polo style shirt.[186]  The victim told Haynes that, at the time she was sexually assaulted, Hawthorne also took her purse which contained bank cards, cash, a broken iPhone, and personal items.[187]  Haynes instructed the victim leave the bank cards activated for several days.[188]  Days later, the victim's mother informed him that one of the bank cards was used at a gas station on Behrman Highway.[189]  Haynes reviewed several hours of video surveillance from the gas station, but the surveillance did not lead to a suspect.[190]  Haynes admitted, however, that there were a number of areas of the gas station where a bank card could be used that could not be seen by the cameras.[191]  Haynes learned of the perpetrator's name after receiving the DNA results from the sexual assault kit, but he was unable to locate Hawthorne.[192]

---

[181] *Id.* at 182, 186-87.
[182] *Id.* at 195.
[183] *Id.* at 203, 205.
[184] *Id.* at 196.
[185] *Id.* at 197.
[186] *Id.*
[187] *Id.* at 197-98.
[188] *Id.* at 198.
[189] *Id.*
[190] *Id.* at 198-99.
[191] *Id.* at 209.
[192] *Id.* at 199-200.

Haynes later got an arrest warrant for Hawthorne after determining that the sex was nonconsensual.[193]

Curtis Hawthorne testified in his own defense.[194] Hawthorne testified to the jury that he went out on February 8, 2013, and attended some parades and went to a few bars.[195] He drove a 2005 Honda Accord that did not belong to him.[196] He and his then girlfriend, Dariann, who was pregnant, were walking towards the car when she ran into friends.[197] Because Dariann said she could not walk any farther, he left her to go retrieve the car.[198] Hawthorne claimed that, when he returned, he could not find Dariann, and he drove around looking for her.[199] On his fourth time around, the victim flagged him down in an effort to stop him.[200] Hawthorne testified that the victim told him that she was lost and was looking for her hotel.[201] Hawthorne claimed that he told the victim that he did not know where the hotel was located, and started to pull away.[202] The victim asked him to help her find the hotel.[203] Hawthorne stated that he declined because he did not have enough gas.[204] However, the victim allegedly offered to pay him gas money and got into the car.[205]

---

[193] *Id.* at 210, 213.
[194] *Id.* at 215-251.
[195] *Id.* at 217-18.
[196] *Id.* at 218.
[197] *Id.* at 218-19.
[198] *Id.* at 219.
[199] *Id.* at 219-20.
[200] *Id.* at 220-21.
[201] *Id.* at 221.
[202] *Id.*
[203] *Id.*
[204] *Id.*
[205] *Id.* 221-22.

Hawthorne testified that he and the victim talked while searching for her hotel.[206] Hawthorne claimed that the victim removed her sweater, and that he could see what appeared to be glowing stars under her see-through shirt.[207]  According to Hawthorne, when he asked the victim what was under her shirt, she reclined the seat back and pulled up her shirt, revealing her breasts that had stars on them with the words "kiss" and "me."[208]  Hawthorne claimed the victim grabbed his right hand and placed it on her breast.[209]  Hawthorne stopped the car, and they started kissing.[210]  He allegedly told the victim that he did not feel safe having sex where they were located because they were in a lit area and people were around.[211]  Hawthorne maintained that the victim told him that if they found her hotel they could have sex there.[212]

They continued to look for her hotel, but at some point they went somewhere where they were both comfortable.[213]  Hawthorne claimed that they both got into the back seat, disrobed, and had consensual sex.[214]  Hawthorne denied having a gun and forcing the victim to have sex.[215] Hawthorne asserted that afterwards they dressed and he drove towards Canal Street because he had to pick up Dariann.[216]  Hawthorne maintained that he dropped the victim off in a parking lot

---

[206] *Id.* at 222-23.
[207] *Id.* at 223.
[208] *Id.* at 223-24.
[209] *Id.* at 224.
[210] *Id.*
[211] *Id.*
[212] *Id.*
[213] *Id.* at 225.
[214] *Id.* at 225-26.
[215] *Id.* at 226-27, 230.
[216] *Id.* at 228-29.

and gave her some cash to pay for a taxi.[217]  Hawthorne denied kidnapping the victim, and further denied taking her purse or any of her property.[218]  He also denied using her debit card.[219]

Hawthorne claimed that when he went to pick up his child from Jupiter, he saw police with their tasers and "got spooked" and ran.[220]  He denied ever showing Jupiter a gun or disposing of it as he ran.[221]  He testified that he did not hear Jupiter say anything when he ran.[222]  He professed that he did not learn of the charges until he was arrested.[223]

Hawthorne could not explain why the "kiss" and "me" nipple stars were not found during the victim's sexual assault examination.[224]  Nor could he explain how the victim ended up bruised and barefoot at the Guste Apartments.[225]  Hawthorne claimed that all the State witnesses lied.[226]

Based on the verdict, the jury apparently rejected Hawthorne's testimony and found the victim's testimony and that of the other State witnesses to be the more credible version of the facts. To the extent that Hawthorne challenges the credibility of the victim, challenges to the accuracy of witness testimony go to credibility, which is a matter left to the judgment of the trier of fact, and a reviewing court cannot reevaluate that credibility determination.[227]  A federal habeas court generally will not grant relief on an insufficient evidence claim premised on credibility issues.[228]

---

[217] *Id.* at 229-30, 244.

[218] *Id.* at 230, 232.

[219] *Id.* at 232.

[220] *Id.* at 230-31, 247-48.

[221] *Id.* at 231, 246.

[222] *Id.* at 247.

[223] *Id.* at 231.

[224] *Id.* at 243-44.

[225] *Id.* at 245.

[226] *Id.* at 247.

[227] *State v. Thomas*, 13 So. 3d 603, 607 (La. App. 5th Cir. 2008); *see also Passman v. Blackburn*, 652 F.2d 559, 569 (5th Cir. 1981) (that the jury chose to believe a witness whose credibility was challenged is not a question of constitutional dimensions); *Holderfield v. Jones*, 903 F. Supp. 1011, 1018 (E.D. La. 1985) (habeas courts should defer to the jury's credibility determinations and justifiable inferences of fact.) (citing *United States v. Hatch*, 926 F.2d 387, 399 (5th Cir. 1991)).

[228] *See Schlup v. Delo*, 513 U.S. 298, 330 (1995) ("[U]nder *Jackson*, the assessment of the credibility of

Further, a state court's decision denying a claim on the merits is considered "unreasonable" only when it runs afoul of the law as set forth by the United States Supreme Court. If the Supreme Court's "cases give no clear answer to the question presented, let alone one in [the petitioner's] favor, it cannot be said that the state court unreasonably applied clearly established Federal law."[229] Here, Hawthorne has not identified – and this Court's independent research has not uncovered – a United States Supreme Court case with evidence analogous to that presented in this case in which the Supreme Court determined that the *Jackson* standard was unmet.

In summary, viewing the evidence in the light most favorable to the prosecution in accordance with *Jackson*, the State presented sufficient evidence for a reasonable trier of fact to conclude that each element of aggravated rape, aggravated kidnapping, and armed robbery was established. Therefore, the state courts' denial of relief on this claim was not contrary to or an unreasonable application of Supreme Court precedent. Accordingly, under the doubly deferential standards of review which must be applied by this federal habeas court, relief is not warranted.

**B.** **Claim 2: Admission of Hawthorne's Statement**

Hawthorne claims that the trial court erred in admitting evidence of a statement that he made to Jupiter before he was apprehended that he knew he was a wanted man. Hawthorne claims that the State violated Louisiana discovery rules in failing to disclose the statement before the morning of trial.

---

witnesses is generally beyond the scope of review."); *Ramirez v. Dretke*, 398 F.3d 691, 695 (5th Cir. 2005) ("All credibility choices and conflicting inferences are to be resolved in favor of the verdict."); *McCowin v. Scott*, No. 93-5340, 24 F.3d 240, 1994 WL 242581, at *2 (5th Cir. May 26, 1994); *Phillips v. Cain*, No. 11-2725, 2012 WL 2564926, at *14 (E.D. La. Apr. 11, 2012), *R&R. adopted*, 2012 WL 2565025 (E.D. La. July 2, 2012); *Picou v. Cain*, No. 06-6258, 2007 WL 1521021, at *5 (E.D. La. May 22, 2007).

[229] *Wright v. Van Patten*, 552 U.S. 120, 126 (2008) (quotation marks and brackets omitted).

The State responds that Hawthorne's claim is not cognizable on federal habeas review.  It further argues that, to the extent Hawthorne presents a federal claim, the state courts' decision was not a clearly erroneous interpretation of United States Supreme Court precedent.

Hawthorne's claim that the trial court erred in admitting the evidence was considered and rejected by the state courts on direct appeal.  The Louisiana Fourth Circuit Court of Appeal reasoned:

> In a second assignment of error, Defendant argues that the district court erred in admitting into evidence Ms. Jupiter's statement that Defendant told her on October 7, 2013, that he knew he was wanted by the police.  Defendant bases his argument on the assertion that he was not given timely notice of the statement pursuant to La.C.Cr.P. art. 716(B).

> The record in this case indicates that the defense filed a motion for discovery on October 22, 2013, which sought the disclosure of statements made by Defendant that the State intended to offer into evidence.  However, it was not until December 1, 2014, prior to *voir dire*, that the State filed a notice pursuant to La.C.Cr.P. arts. 716, 721, 722, 767 and 768 of its intent to introduce Defendant's statement at trial. Subsequently, the defense twice objected to the admission of the statement during trial and moved for a mistrial.  The district judge overruled the defense objections and denied the request for a mistrial.

> "Louisiana's criminal discovery rules are intended to eliminate unwarranted prejudice arising from surprise testimony and evidence, to permit the defense to meet the state's case, and to allow a proper assessment of its evidence in preparing a defense." *State v. Allen*, 94–2262, p. 4 (La. 11/13/95), 663 So.2d 686, 688 (citations omitted). *See also State v. Harris*, 2000–3459, p. 8 (La. 2/26/02), 812 So.2d 612, 617; *State v. Woodberry*, 2014–0476, p. 19 (La. App. 4 Cir. 6/3/15), 171 So.3d 1082, 1094. "The failure of the State to comply with discovery rules does not bring automatic reversal; rather, prejudice must be shown." *Harris*, 2000–3459 at p. 8, 812 So.2d at 617 (citing *State v. Statum*, 390 So.2d 886, 889-90 (La. 1980), *cert. denied*, 450 U.S. 969, 101 S.Ct. 1489, 67 L.Ed.2d 619 (1981)). "When a defendant is lulled into misapprehension of the strength of the State's case as a result of the prosecution's failure to timely or fully disclose discoverable evidence and the defendant suffers prejudice, basic unfairness results which constitutes reversible error." *Id.* (citing *State v. Mitchell*, 412 So.2d 1042, 1044 (La. 1982)). A mistrial is a drastic remedy and, except in instances in which the mistrial is mandatory, is warranted only when a trial court error results in substantial prejudice to the defendant, depriving him of a reasonable expectation of a fair trial. *Id.*, 2000–3459, at pp. 8-9, 812 So.2d at 617 (citing *State v. Comeaux*, 514 So.2d 84, 96 (La. 1987)).  Determining whether such prejudice has resulted is within the sound

discretion of the trial judge. *State v. Smith*, 430 So.2d 31, 44 (La. 1983) (citing *State v. Haynes*, 339 So.2d 328 (La. 1976).

The defense concedes that the content or substance of the statement may not have been subject to disclosure, but argues that because the State failed to timely notify the defense of the statement in compliance with discovery requirements, it was denied the opportunity to investigate the matter, *i.e.*, locate witnesses who may have testified that the statement was not made. Defendant also complains that he was unable to question the police officers at a motion hearing or during cross-examination regarding the statement because the defense was unaware of its existence.

Having reviewed the record before us, we find no evidence of prejudice as a result of the State's delay in disclosing the statement made to a testifying witness by Defendant. Accordingly, we find no abuse of the district court's considerable discretion in denying the mistrial and allowing the statement into evidence.

First, La.C.Cr.P. art. 716 does not specify a time frame within which the prosecution must inform a defendant of the existence of a statement made by a defendant. La.C.Cr.P. art. 716 is contained in Title XXIV of the Code of Criminal Procedure titled: "Procedures Prior to Trial"; thus, the State's notice to Defendant prior to trial cannot be found untimely. However, even if the notice was not timely, Defendant has failed to prove he was prejudiced by the State's delay. Defendant was arrested pursuant to the cooperation of Ms. Jupiter; hence, the defense was aware of her potential as a witness at trial and, in fact, had an opportunity to cross-examine her. Moreover, the defense was notified of the statement prior to the commencement of trial, diminishing the element of surprise.

In addition, Defendant took the stand and denied making any statement to Ms. Jupiter about being wanted by the police. Since he was afforded the opportunity to address the issue and was able to cross-examine Ms. Jupiter, we do not find that the State's tardy disclosure of the existence of the statement resulted in an unfair trial. *See State v. Nogess*, 490 So.2d 488, 490 (La. App. 4 Cir. 1986) (State's failure to comply with La.C.Cr. P. art. 716(B) not prejudicial where defendant was given an opportunity to address the issue and clear up conflicting accounts).

The State established Defendant's guilt of aggravated rape, aggravated kidnapping and armed robbery through overwhelming scientific DNA evidence and through the credible, consistent testimony of Victim and corroborating witnesses. Considering the whole of the evidence offered to establish Defendant's guilt, we do not find the State's delay in providing Defendant with notice that his statement made to Ms. Jupiter would be offered at trial adversely affected the outcome of Defendant's trial. This assignment is meritless.[230]

---

[230] *Hawthorne*, 2016 WL 4211361, at *7-8 (footnote omitted); St. R. Vol. 7 of 9, 4th Cir. Opinion, 2015-KA-0675, at 14-17, 8/10/16 (footnote omitted).

The Louisiana Supreme Court denied Hawthorne's related writ application without assigning reasons.[231]

To the extent Hathorne argues that the evidence of his statement to Jupiter was admitted in violation of Louisiana law, that claim is not cognizable on federal habeas review.[232]  Habeas corpus review is limited to questions of constitutional dimension, and federal courts generally do not review the admissibility of evidence under state law.[233]  States are free to implement procedures regarding the admission of evidence, provided those procedures do not infringe on a constitutional guarantee.[234]  Furthermore, there is no general federal constitutional right to discovery in a criminal case, and, therefore, a claim that a prosecutor violated state discovery rules simply is not cognizable on federal habeas review.[235]

Federal courts do not sit to review the propriety of state court evidentiary rulings, unless the proceedings violate due process such that the violation renders the criminal proceeding fundamentally unfair.[236]  As the Fifth Circuit has explained, this high standard is not easily satisfied:

> Due process is implicated only for rulings "of such a magnitude" or "so egregious" that they "render the trial fundamentally unfair."  It offers no authority to federal habeas courts to review the mine run of evidentiary rulings of state trial courts. Relief will be warranted only when the challenged evidence "played a crucial, critical, and highly significant role in the trial."

---

[231] *Hawthorne*, 221 So. 3d at 855; St. R. Vol. 7 of 9, La. Sup. Ct. Order, 2016-KO-1676, 5/26/17.

[232] *See Swarthout v. Cooke*, 562 U.S. 216, 219 (2011).

[233] *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991); *Gonzales v. Thaler*, 643 F.3d 425, 429 (5th Cir. 2011); *Jernigan v. Collins*, 980 F.2d 292, 298 (5th Cir. 1992).

[234] *Burgett v. Texas*, 389 U.S. 109 (1967).

[235] *Weatherford v. Bursey*, 429 U.S. 545, 559 (1977); , 455 Fed. App'x 478, 486 (5th Cir. 2011); *Lorraine v. Coyle*, 291 F.3d 416, 441 (6th Cir. 2002); *Burns v. Lafler*, 328 F. Supp. 2d 711, 723 (E.D. Mich. 2004).

[236] *Lisenba v. People of the State of California*, 314 U.S. 219, 236-37 (1941); *Peters v. Whitley*, 942 F.2d 937, 940 (5th Cir. 1991) (Habeas review is proper only to determine whether a state trial judge's error is so extreme as to render the trial fundamentally unfair or violate an explicit constitutional right.).

The due process inquiry must consider the significance of the challenged evidence "in the context of the entire trial." We have held that the Due Process Clause does not afford relief where the challenged evidence was not the principal focus at trial and the errors were not "'so pronounced and persistent that it permeates the entire atmosphere of the trial.'" This is a high hurdle, even without AEDPA's added level of deference.[237]

This issue presents a mixed question of law and fact.[238] Under the applicable standard of review, this Court therefore must determine if the state courts' decision is contrary to or involved an unreasonable application of Supreme Court precedent prohibiting an unfair trial.

As an initial matter, Hawthorne has failed to establish any error by the trial court which would trigger review under due process standards.[239] The admission of the evidence was affirmed by the Louisiana Fourth Circuit as proper under state law. The Louisiana Supreme Court similarly denied relief without providing additional reasons.

Of course, pursuant to *Brady v. Maryland*[240] and its progeny, it is a federal constitution violation for a prosecutor to suppress material evidence favorable to the defense. To prove a *Brady* violation, Hawthorne must establish that the evidence is favorable to the accused as exculpatory or impeachment, that the evidence was suppressed by the State, and that prejudice resulted from the non-disclosure.[241] For the following reasons, Hawthorne fails to show that any such violation occurred.

---

[237] *Gonzales*, 643 F.3d at 430-31 (footnotes omitted).

[238] *Wilkerson v. Cain*, 233 F.3d 886, 890 (5th Cir. 2000).

[239] *Robinson v. Whitley*, 2 F.3d 562, 567 (5th Cir. 1993) (where there is no showing of error by a trial court, there can be fundamental unfairness); *Neal v. Cain*, 141 F.3d 207, 214 (5th Cir. 1998).

[240] 373 U.S. 83 (1963).

[241] *Banks v. Dretke*, 540 U.S. 668, 691 (2004) (citing *Strickler*, 527 U.S. at 281-82, 119 S. Ct. 1936); *Reed*, 739 F.3d at 782.

Initially, the statement was not favorable to the defense. It was neither exculpatory nor useful for purposes of impeachment; on the contrary, it was inculpatory. The mere fact that it might have been *helpful* to the defense in preparing for trial is of no moment.[242]

Further, the statement was not "suppressed." The State disclosed the existence of the statement in advance of trial.[243] It did delay disclosing the actual contents of the statement until opening statement,[244] but the evidence came to light during trial in sufficient time for defense counsel to put it to effective use. Thus, it was not "suppressed" in violation of *Brady.*[245]

Finally, there is no indication in the record that the evidence relating to Hawthorne's statement to Jupiter that he knew he was wanted misled the jury into reaching an improper verdict. Hawthorne has not demonstrated that the evidence was inadmissible or rendered his trial fundamentally unfair. Because he has not demonstrated error in the admission of the evidence, he "has no basis for any alleged due process violation" or denial of a fundamentally fair trial.[246] Even if he had shown an error, the evidence was not so prejudicial as to violate due process standards.

The denial of relief on this claim was not contrary to, or an unreasonable application of, Supreme Court precedent. Hawthorne is therefore not entitled to relief as to this claim.

## C.    Claim 3: Admission of the Handgun

Hawthorne next claims that the trial court erred in admitting evidence that a handgun was found after Hawthorne was apprehended. He claims that the State failed to disclose the evidence

---

[242] *See, e.g.*, *Kyles v. Whitley*, 514 U.S. 419, 436–37, 115 S. Ct. 1555, 131 L.Ed.2d 490 (1995) ("[T]he Constitution is not violated every time the government fails or chooses not to disclose evidence that might prove helpful to the defense.").

[243] St. R. Vol. 3 of 9, at 102, State's Notice Pursuant to La. C. Cr. P. Art. 716, 721-722, 767, & 768, 12/1/14.

[244] St. R. Vol. 6 of 9, at 39-41, Trial Tr., 12/1-2/14.

[245] *See, e.g.*, *Lawrence v. Lensing*, 42 F.3d 255, 257 (5th Cir.1994); *United States v. McKinney*, 758 F.2d 1036, 1049-50 (5th Cir.1985); *Stogner v. Cain*, Civ. Action No. 05-4317, 2008 WL 269078, at *20 (E.D. La. Jan.30, 2008); *Baker v. Cain*, Civ. Action No. 05–3772, 2007 WL 1240203, at *5 (E.D. La. Apr.26, 2007).

[246] *Robinson v. Whitley*, 2 F.3d 562, 567 (5th Cir. 1993); *Neal v. Cain*, 141 F.3d 207, 214 (5th Cir. 1998).

related to the gun in violation of *Brady*.[247]  He also argues that the State's failure to disclose Jupiter's statement that Hawthorne showed her that he was carrying a gun violated *Brady*.

The State responds that Hawthorne's claim is not cognizable on federal habeas review.  It further argues that the state courts' decision was not an unreasonable application of Supreme Court precedent.

On October 22, 2013, Hawthorne's counsel filed a motion to suppress.[248]  On January 23, 2014, the trial court held a hearing on the motion to suppress at which time Detective Frankie Watts testified.[249]  At the conclusion of the hearing, the trial court found that the firearm had been abandoned, and denied the motion to suppress.[250]

On March 7, 2014, defense counsel filed a motion *in limine* to exclude evidence related to the seizure of the handgun as irrelevant and unduly prejudicial under Louisiana law.[251]  The trial court denied the motion on March 10, 2014.[252]  Defense counsel re-urged the motion the morning of the first day of trial.[253]  The trial court denied the motion.[254]

In the last reasoned opinion, on direct appeal, the Louisiana Fourth Circuit rejected Hawthorne's claim relating to the admission of evidence relating to the handgun reasoning:

> In a second *pro se* assignment, Defendant claims he was prejudiced when the State was allowed to present testimony which established that he abandoned a gun as he fled the arresting police officers.

---

[247] 373 U.S. 83, 87 (1963).

[248] St. R. Vol. 4 of 9 at 381-87, Omnibus Motion for Discovery; Motion to Preserve Evidence; Motion for Suppression of Statements, Evidence and Identifications; and Motion for a Preliminary Examination, 10/22/13.

[249] St. R. Vol. 3 of 9 at 20, Min. Entry, 1/23/14; St. R. Vol. 7 of 9 at 1-27, Hearing Transcript, 1/23/14.

[250] St. R. Vol. 7 of 9 at 25-26, Hearing Transcript, 1/23/14.

[251] St. R. Vol. 4 of 9 at 372-75, Motion In Limine to Exclude Irrelevant and Prejudicial Evidence under, *Inter Alia*, Article 403 of the Louisiana Code of Evidence, 3/7/14.

[252] St. R. Vol. 3 of 9 at 24, Min. Entry, 3/10/14.

[253] St. R. Vol. 6 of 9 at 11-12, Tr. Trans., 12/1-2/14.

[254] *Id.* at 12.

Defendant filed a motion to suppress the evidence. After a hearing on January 23, 2014, the district judge determined there was no basis for the motion because the gun had been abandoned, as shown through the testimony of Detective Frankie Watts ("Det. Watts"). Det. Watts testified that he obtained an arrest warrant for Defendant on the instant charges in February 2013. Det. Watts made several unsuccessful attempts to execute the warrant. However, on October 7, 2013, Det. Watts received information that Defendant was in a park near Franklin Avenue, and he enlisted the aid of additional members of the warrant squad to affect Defendant's arrest. When the officers arrived at the park in marked vehicles wearing their NOPD gear, Defendant fled. As Det. Watts and other officers pursued Defendant, Det. Watts noticed Defendant holding the right front side of his pants. As Det. Watts ran past Ms. Jupiter, she cautioned him that Defendant was armed with a gun. Defendant was eventually apprehended. Since Det. Watts was aware Defendant was armed at the time he fled, officers retraced Defendant's flight path and recovered a gun in a vacant lot.

"[T]rial courts are vested with great discretion when ruling on a motion to suppress and, consequently, the ruling of a trial judge on a motion to suppress will not be disturbed absent an abuse of that discretion." *State v. Carter*, 2012–0317, p. 3 (La. App. 4 Cir. 3/20/13), 112 So.3d 381, 383 (citing *State v. Lampton*, 2011–0775, p. 5 (La. App. 4 Cir. 6/11/12), 95 So.3d 1199, 1202.)

"It is a basic tenet of Fourth Amendment law that warrantless searches and seizures are presumptively unreasonable." *State v. Jason*, 2010–0658, p. 6 (La. App. 4 Cir. 12/1/10), 53 So.3d 508, 511 (citing *Payton v. New York*, 445 U.S. 573, 587, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980). "If, however, property is abandoned without any unlawful intrusion into a citizen's right to be free from government interference, then such property may be lawfully seized. In such cases, there is no expectation of privacy and thus no violation of a person's custodial rights." *State v. Belton*, 441 So.2d 1195, 1199 (La.1983). In this case, Defendant's weapon was seized during the execution of a warrant for his arrest. There was no unlawful intrusion into Defendant's right to be free from government interference; therefore, the gun was properly seized.

Based upon the evidence adduced at the hearing on the motion to suppress, the district judge's ruling was not an abuse of his discretion. This assignment is without merit.[255]

The Louisiana Supreme Court denied writs without assigning reasons.[256]

---

[255] *Hawthorne*, 2016 WL 4211361, at *8-9; St. R. Vol. 7 of 9, 4th Cir. Opinion, 2015-KA-0675, at 17-19, 8/10/16.

[256] *Hawthorne*, 221 So. 3d at 855; St. R. Vol. 7 of 9, La. Sup. Ct. Order, 2016-KO-1676, 5/26/17.

To the extent that Hawthorne argues that the state courts misapplied state evidence law in finding the evidence related to the handgun admissible, his claim is not reviewable in this federal proceeding. As the United States Fifth Circuit Court of Appeals has held: "In habeas actions, [a federal court] does not sit to review the mere admissibility of evidence under state law."[257]

To the extent that Hawthorne argues that admission of the evidence violates federal law, his claim fares no better. As the State points out, this Court is barred from reviewing any Fourth Amendment claim by the Supreme Court's long-standing prohibition in *Stone v. Powell.*[258] In *Stone*, the Supreme Court held that "where the State has provided an opportunity for full and fair litigation of a Fourth Amendment claim, a state prisoner may not be granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search or seizure was introduced at trial."[259] The "full and fair" hearing contemplated by *Stone* refers to thoughtful consideration by the factfinder and at least the availability of meaningful appellate review by a higher state court.[260]

The United States Fifth Circuit has interpreted an "opportunity for full and fair litigation" to mean just that, "an opportunity."[261] "If a state provides the processes whereby a defendant can obtain full and fair litigation of a fourth amendment claim, *Stone v. Powell* bars federal habeas corpus consideration of that claim whether or not the defendant employs those processes."[262] "[I]t is the existence of state processes allowing an opportunity for full and fair litigation of fourth amendment claims, rather than a defendant's use of those processes, that serves the policies

---

[257] *Little v. Johnson*, 162 F.3d 855, 862 (5th Cir. 1998)

[258] 428 U.S. 465 (1976).

[259] *Id.* at 494 (footnotes omitted).

[260] *Davis v. Blackburn*, 803 F.2d 807, 808 (5th Cir. 1986); *O'Berry v. Wainwright*, 546 F.2d 1204, 1213 (5th Cir. 1977).

[261] *Caver v. Alabama*, 577 F.2d 1188, 1192 (5th Cir. 1978); *Janecka v. Cockrell*, 301 F.3d 316, 320 (5th Cir. 2002).

[262] *Caver*, 577 F.2d at 1192.

underlying the exclusionary rule and bars federal habeas corpus consideration of claims under *Stone v. Powell*."[263]

Thus, it is the opportunity to present a Fourth Amendment claim to the state courts that is the basis of the *Stone* prohibition without regard for whether that opportunity is actually exercised by the petitioner or his attempts at relief were unsuccessful.[264]   This Court has repeatedly held that "[i]t is beyond cavil that Louisiana courts provide criminal defendants the opportunity to raise Fourth Amendment claims."[265]   Even when a state defendant fails to take advantage of the opportunity to litigate a motion to suppress or assert a Fourth Amendment claim, the fact that the opportunity existed suffices for the *Stone* bar to apply to prevent federal habeas review.[266]

In this case, Hawthorne was not only afforded an opportunity for full and fair litigation of any Fourth Amendment claim in state court, but he in fact availed himself of that opportunity.  The state court record shows that defense counsel filed a motion to suppress, Hawthorne's claim was fully litigated and denied after a hearing, and the claim was asserted, considered, and again denied on direct review.  Because Hawthorne was afforded a full and fair opportunity to litigate his claim in state courts, *Stone* bars this Court from considering that claim.[267]

Finally, in *Brady*. the United States Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."[268]   The duty to disclose this kind of evidence exists even though there has been

---

[263] *Williams*, 609 F.2d at 220.

[264] *Janecka*, 301 F.3d at 320-21.

[265] *Bailey v. Cain*, No. 06-839, 2007 WL 1198911, at *13 (E.D. La. Apr. 20, 2007) (order adopting report and recommendation).

[266] *Id.* at 320.

[267] *Cardwell v. Taylor*, 461 U.S. 571 (1983); *Jones v. Johnson*, 171 F.3d 270, 278 (5th Cir. 1999); *Davis v. Cain*, No. 07-6389, 2008 WL 5191912, at *18 (E.D. La. Dec. 11, 2008).

[268] *Brady*, 373 U.S. at 87.

no request by the defendant.[269]  The prosecution's duty to disclose includes both exculpatory and

impeachment evidence.[270]

       To the extent that Hawthorne claims that the State's failure to disclose evidence related to

the gun as well as Jupiter's statement that Hawthorne showed her that he had a gun on his person

violated *Brady*,[271] that claim also fails.   *Brady* claims involve "the discovery, *after trial* of

information which had been known to the prosecution but unknown to the defense."[272]

Significantly, the *Brady* disclosure requirement applies only to exculpatory and impeachment

evidence, not to inculpatory or neutral evidence.[273]  "If the evidence is inculpatory, then *Brady* is

not violated, regardless of the effect at trial of the nondisclosure."[274]   Again, to prove a *Brady*

violation, Hawthorne must establish that the evidence is favorable to the accused as exculpatory

or impeachment, that the evidence was suppressed by the State, and that prejudice resulted from

the non-disclosure.[275]

       In this case, there was no *Brady* violation.  First, the defense was aware of the evidence

related to the discovery of the gun before trial, and in fact moved to suppress the evidence.[276]

Further, the fact that Jupiter told officers that Hawthorne was carrying a gun was disclosed to

---

[269] *Strickler v. Greene*, 527 U.S. 263, 280 (1999) (citing *United States v. Agurs*, 427 U.S. 97, 107, 96 S. Ct. 2392, 49 L.Ed.2d 342 (1976)); *Hall v. Thaler*, 504 F. App'x 269, 273 (5th Cir. 2012) (citing *Kyles v. Whitley*, 514 U.S. 419, 433, 115 S. Ct. 1555, 131 L.Ed.2d 490 (1995)).

[270] *Strickler*, 527 U.S. at 280 (citing *United States v. Bagley*, 473 U.S. 667, 676, 105 S. Ct. 3375, 87 L.Ed.2d 481 (1985)); *United States v. Valas*, 822 F.3d 228, 236-37 (5th Cir. 2016).

[271] *See* ECF No. 5-1, at 23-24.

[272] *Lawrence v. Lensing*, 42 F.3d 255, 257 (5th Cir. 1994) (quoting *Agurs*, 427 U.S. at 103, 96 S. Ct. 2392) (emphasis added); *accord Reed v. Stephens*, 739 F.3d 753, 783 (5th Cir. 2014).

[273] *See United States v. Nixon*, 881 F.2d 1305, 1308 (5th Cir. 1989); *see also Lawrence v. Lensing*, 42 F.3d 255, 257 (5th Cir. 1994); *Andrews v. Collins*, 21 F.3d 612, 626 (5th Cir. 1994).

[274] *United States v. Gonzales*, 90 F.3d 1363, 1369 (8th Cir. 1996).

[275] *Banks v. Dretke*, 540 U.S. 668, 691 (2004) (citing *Strickler*, 527 U.S. at 281-82, 119 S. Ct. 1936); *Reed*, 739 F.3d at 782.

[276] St. R. Vol. 1 of 9, Mins., 1/23/14; St. R. Vol. 7 of 9 at 1-27, Hearing Trans., 1/23/14; *id.* at 7, New Trial Hearing Trans., 1/5/15 (the trial court noted "the gathering of the gun did not come as a surprise at trial because you knew about that from the motion hearing months before.").

Hawthorne at the suppression hearing.[277]  Thus, no information was withheld in violation of *Brady*.

"[W]hen information is fully available to a defendant at the time of trial . . . the defendant has no

*Brady* claim."[278]  Moreover, the evidence was *inculpatory* rather than exculpatory or impeaching

in nature.  Finally, defense counsel was able to impeach the witnesses, to the extent possible, during

trial.

 For all of these reasons, Hawthorne has not established that his claim is cognizable on

federal habeas corpus review or that the state courts' decision rejecting his claim was contrary to,

or involved an unreasonable application of, clearly established federal law, as determined by the

Supreme Court of the United States.  Accordingly, this claim should be denied.

### D.    Claim 4(a): Victim's Presence in the Courtroom

 Hawthorne next claims that he was denied the right to a fair and impartial trial when the

victim was allowed to remain in the courtroom throughout the State's case-in-chief.  He argues

that the victim was permitted to listen to the testimony of four State witnesses before providing

her own testimony in violation of LA. CODE EVID. art. 615.

 At the outset, for the reasons explained later in section IV(G)(2)(a), the trial court did not

violate the provisions of article 615 which specifically exempts a "victim of the offense" from the

rule of sequestration.  In any event, the Fifth Circuit has held that a "state court's failure to follow

its own procedural rules [on sequestration of witnesses] does not of itself raise federal

constitutional questions cognizable in habeas corpus."[279]  Thus, even had the victim's presence in

---

[277] St. R. Vol. 7 of 9, at 8-11, Suppression Hearing Tr., 1/23/14.

[278] *United States v. Brown*, 628 F.2d 471, 473 (5th Cir. 1980); *see also Smith v. Travis*, No. 08-4627, 2009
WL 1704335, at *10 (E.D. La. June 16, 2009) ("Where, as here, the evidence at issue came to light during
trial in sufficient time for defense counsel to put it to effective use, it was not 'suppressed' in violation of
*Brady* and its progeny.").

[279] *Passman v. Blackburn*, 652 F.2d 559, 569 (5th Cir.1981) (citations omitted).

the courtroom before testifying violated state procedural law, it does not provide Hawthorne a basis for federal habeas relief.

A "complaint that the trial court failed to invoke the rule of sequestration of witnesses does not raise a question that can be reached by federal habeas corpus, since such denial does not amount to a deprivation of [the petitioner's] constitutional rights."[280]  While sequestration of witnesses "is a long-established and well-recognized measure designed to increase the likelihood that testimony will be candid," it is not required by the Due Process Clause.[281]

For all of these reasons, Hawthorne has not established that his claim is cognizable on federal habeas corpus review or that the state courts' decision rejecting it was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States.  Accordingly, this claim should be denied.

E.    **Claim Five(a): Prosecutorial Misconduct**

Hawthorne alleges that the prosecutor committed misconduct during opening statement and closing argument which resulted in a denial of his right to a fair and impartial trial.  Hawthorne, who admits that he is relying on his memory rather than a transcript, claims that the prosecutor told the jury that it "needed to protect society from Predators such as Mr. Hawthorne" and that "Mr. Hawthorne had 'stalked' an innocent tourist in order to satisfy his needs."[282]  He further claims that the prosecutor told the jury, "The man has destroyed this young woman's life," and said, "What kind of man preys on innocent tourists?  We *have* to protect the visitors to this great city and state."[283]  Hawthorne claims that the prosecutor told the jury during opening statements

---

[280] *Mathis v. Wainwright*, 351 F.2d 489 (5th Cir.1965) (citation omitted).
[281] *Bell v. Duckworth*, 861 F.2d 169, 170 (7th Cir.1988).
[282] ECF No. 5-1, at 31.
[283] *Id.*

to "think how you would feel if this happened to you while you were on vacation."[284]  He further

claims that the prosecutor told the jury, "This man has gotten away with breaking the law long

enough.  It's time for you to tell him he can't do that any time," and that "This man has destroyed

enough lives."[285]  Hawthorne claims that the trial court failed to instruct the jury to disregard the

statements.

The State responds that Hawthorne's claim is not cognizable.  It further asserts that the

state courts' decision was not an unreasonable application of Supreme Court precedent.

A prosecutor's comment does not present a claim of constitutional magnitude in a federal

habeas action unless it is so prejudicial that the trial was rendered fundamentally unfair in violation

of the Due Process Clause.[286]  "[I]t is not enough that the prosecutors' remarks were undesirable

or even universally condemned.  The relevant question is whether the prosecutors' comments so

infected the trial with unfairness as to make the resulting conviction a denial of due process."[287]

The prosecutor's remarks must be evaluated in the context of the entire trial.[288]  Ultimately, "the

touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of

the trial, not the culpability of the prosecutor."[289]

A two-step analysis is utilized when reviewing claims of prosecutorial misconduct.[290]

First, the court must determine whether the prosecutor made an improper remark.[291]  It is well

---

[284] *Id.* at 33.

[285] *Id.* at 37-38.

[286] *Jones v. Butler*, 864 F.2d 348, 356 (5th Cir. 1988).

[287] *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (citations and quotations omitted); *accord Rogers v. Lynaugh*, 848 F.2d 606, 608 (5th Cir. 1988); *Bell v. Lynaugh*, 828 F.2d 1085, 1095 (5th Cir. 1987).

[288] *Greer v. Miller*, 483 U.S. 756, 765–66 (1987) (citing *Darden*, 477 U.S. at 179); *Kirkpatrick v. Blackburn*, 777 F.2d 272, 281 (5th Cir. 1985).

[289] *Smith v. Phillips*, 455 U.S. 209, 219 (1982).

[290] *United States v. Wise*, 221 F.3d 140, 152 (5th Cir. 2000); *United States v. Lankford*, 196 F.3d 563, 574 (5th Cir. 1999).

[291] *Wise*, 221 F.3d at 152.

settled that the prosecution may permissibly argue to the jury the "inferences and conclusions" that it should draw from the evidence, so long as the assertions are based on the evidence.[292] "Moreover, 'unflattering characterizations of a defendant will not provoke a reversal when such descriptions are supported by the evidence.'"[293]

If the court finds that an improper remark was made, "the second step is to evaluate whether the remark affected the substantial rights of the defendant."[294]  A habeas corpus petitioner "must demonstrate that the misconduct [was] persistent and pronounced or that the evidence of guilt was so insubstantial that the conviction would not have occurred but for the improper remarks."[295] Under this test, a petitioner must demonstrate that the comment rendered his trial "fundamentally unfair" by showing "a reasonable probability that the verdict might have been different had the trial been properly conducted."[296]

For purposes of federal habeas review, a claim of prosecutorial misconduct presents a mixed question of law and fact.[297]  The Court must determine whether the denial of relief was contrary to or an unreasonable application of Supreme Court law.

The Court has reviewed the transcripts of the prosecution's opening statement, closing argument, and rebuttal argument.[298]  The transcripts do not support Hawthorne's claim, based on his memory, that the prosecution made any improper or inappropriate comments let alone the specific remarks claimed by Hawthorne.  Contrary to his claim, at no point during opening statement did the prosecutor claim that Hawthorne stalked an innocent tourist to satisfy his needs

---

[292] *United States v. Delgado*, 672 F.3d 320, 336 (5th Cir. 2012) (citations omitted).
[293] *Delgado*, 672 F.3d at 336, (quoting *United States v. Windom*, 510 F.2d 989, 994 (5th Cir. 1975)) (finding no error in a prosecutor's reference to a defendant as a "con artist").
[294] *Wise*, 221 F.3d at 152.
[295] *Jones*, 864 F.2d at 356; *accord Hogue v. Scott*, 874 F. Supp. 1486, 1533 (N.D. Tex. 1994).
[296] *Rogers*, 848 F.2d at 609 (footnote and citations omitted).
[297] *Brazley v. Cain*, 35 F. App'x 390, 2002 WL 760471, at *4 n. 4 (5th Cir. Apr. 16, 2002).
[298] St. R. Vol. 6 of 9 at 22-43, Tr. Trans., 12/1-2/14; ECF No. 32-1, at 4-16, 26-37.

nor did the prosecutor ask the jurors to consider how they would feel if such a crime happened to them while on vacation.[299]  A review of the transcript of closing arguments similarly demonstrates that the State did not make in its initial or rebuttal closing arguments any of the comments alleged by Hawthorne nor did the prosecution argue that society needed to be protected from people like Hawthorne.[300]  Thus, Hawthorne has failed to meet the threshold showing that the prosecution made any improper comments.

Additionally, jurors were instructed to consider only evidence admitted at trial.  The trial court explicitly told the jury that "[w]hat the lawyers say in Opening Statement is just words that are coming out of their mouth.  It is not under oath.  You are the ultimate orbiters of the facts.  It's your exclusive province to make various determinations."[301]  The trial court further stated, "recognize that this is not evidence.  This is his appreciation of what the evidence will show. Whether he can get it into evidence remains to be seen.  Just always keep in mind that the evidence is going to come from this witness stand and exclusively from this witness stand unless it is documentary."[302]

Before closing arguments, the trial court reminded the jurors, "remember what comes out of the attorney's mouth is not evidence -- as we talked about yesterday morning -- it's just their appreciation as to what the evidence showed."[303]  During closing statements, the trial court instructed, "there should be no sympathy in your decision making process for either side."[304]  After closing arguments, the trial court specifically instructed the jury that "[t]he contents of the Opening

---

[299] St. R. Vol. 6 of 9 at 22-43, Tr. Trans., 12/1-2/14,
[300] *See* ECF No. 32-1, at 4-16, 26-37.
[301] St. R. Vol. 6 of 9 at 30-31, Tr. Trans., 12/1-2/14.
[302] *Id.* at 38.
[303] ECF No. 32-1, at 3.
[304] St. R. Vol. 6 of 9 at 259, Tr. Trans., 12/1-2/14; ECF No. 32-1, at 36.

Statements as well as the Closing Arguments are not to be considered as evidence in this case."[305] The trial court further instructed the jury that "you are not to be influenced.  You are not to be influenced by mere sympathy, passion, prejudice, or public opinion.  You are expected to reach a just and fair verdict."[306]  There is no reason to believe that jurors in this case disregarded those instructions.[307]

Accordingly, Hawthorne fails to establish that the state courts' decision rejecting his prosecutorial misconduct claim was either contrary to, or an unreasonable application of, clearly established Supreme Court law.  He is not entitled to relief as to this claim.

### F.    Claim Six(a): Non-Unanimous Verdict

Hawthorne next asserts that the trial court erred in allowing him to be convicted by a non-unanimous verdict.  He claims that the verdict is unconstitutional

Hawthorne's challenge to the constitutionality of state law presents a pure question of law.[308]  Hawthorne may obtain federal habeas corpus relief only if the state courts' decision was contrary to, or involved an unreasonable application of, clearly established United States Supreme Court precedent.

The AEDPA deferential standard requires this to apply law that was clearly established "at the time the conviction becomes final."[309]  As calculated and explained previously, Hawthorne's conviction was final on August 25, 2017, when he did not file an application for writ of certiorari with the United States Supreme Court within ninety (90) days after the Louisiana Supreme Court

---

[305] ECF No. 34-1, at 24.

[306] *Id.*

[307] *Weeks v. Angelone*, 528 U.S. 225, 234 (2000) ("A jury is presumed to follow its instructions.); *Woods v. Johnson*, 75 F.3d 1017, 1036 n.29 (5th Cir. 1996).

[308] *Ortiz v. Quarterman*, 504 F.3d 492, 496 (5th Cir. 2007).

[309] *Peterson v. Cain*, 302 F.3d 508, 511 (5th Cir. 2002) (citing *Williams*, 529 U.S. 380-81).

denied his post-appeal writ application on May 26, 2017.[310]  At that time, the clearly established United States Supreme Court precedent applicable to his claim was directly contrary to Hawthorne's argument.

In *Apodaca v. Oregon*, 406 U.S. 404 (1972), and *Johnson v. Louisiana*, 406 U.S. 356 (1972), the United States Supreme Court upheld the constitutionality of state laws, including Louisiana's, that permitted criminal defendants to be convicted by less than unanimous jury votes. While the Supreme Court itself has described the *Apodaca/Johnson* holding as "the result of an unusual division among the Justices," it also made clear at that time that "although the Sixth Amendment right to trial by jury requires a unanimous verdict in federal criminal trials, it does not require a unanimous verdict in state criminal trials."[311]

In the habeas corpus context, the United States Fifth Circuit Court of Appeals recognized that a prisoner's constitutional challenge to a state court conviction by a non-unanimous jury must be rejected under *Apodaca/Johnson* "because the Supreme Court 'has not held that the Constitution imposes a jury unanimity requirement.'"[312]  Thus, at the time of Hawthorne's conviction, the use of the non-unanimous verdict rule by the Louisiana court was not contrary to or an unreasonable application of clearly established Supreme Court precedent existing at the time.

Following the finality of his conviction, the Supreme Court issued *Ramos v. Louisiana*,[313] finding that unanimity in state court jury verdicts is required under Sixth Amendment.  On May 17, 2021, however, the Supreme Court held that "*Ramos* announced a new rule of criminal

---

[310] *State v. Hawthorne*, 221 So. 3d 855 (La. 5/26/17); St. R. Vol. 7 of 9, La. Sup. Ct. Order, 2016-KO-1676, 5/26/17.

[311] *McDonald v. City of Chicago*, 561 U.S. 742, 765 n.14 (2010) (citing *Apodaca*, 406 U.S. at 404 and *Johnson*, 406 U.S. at 356).

[312] *Hoover v. Johnson*, 193 F.3d 366, 369 (5th Cir. 1999) (quoting *Richardson v. United States*, 526 U.S. 813, 821 (1999) and citing *Johnson*, 406 U.S. at 366).

[313] 140 S. Ct. 1390, 1407 (2020).

procedure" that "does not apply retroactively on federal collateral review."[314]  *Ramos*, therefore, did not alter the application of the Supreme Court precedent existing at the time of Hawthorne's conviction under AEDPA review.[315]

In 2018, Louisiana voters approved an amendment to Article I, Section 17(A) of the Louisiana Constitution, to require unanimous jury verdicts in cases like this one.  The state constitutional amendment, however, is expressly limited to offenses "committed on or after January 1, 2019."  Accordingly, it does not apply retroactively to Hawthorne's 2014 conviction.

For the foregoing reasons, based upon the law as it was at the time of his conviction, and now, the state courts' denial of relief was not contrary to or an unreasonable application of Supreme Court law.  Hawthorne is not entitled to federal habeas corpus relief on this claim.

### G.    Claims Four(b), Five(b), and Six(b): Ineffective Assistance of Trial Counsel

Hawthorne alleges multiple instances of ineffective assistance of trial counsel. Specifically, he asserts his trial counsel was ineffective in failing to object to: (1) the victim remaining in the courtroom during the State's case-in-chief; (2) prosecutorial misconduct during opening statement and closing arguments; and (3) the non-unanimous verdict.

#### 1. State Court Rulings

Hawthorne asserted each of these arguments in his application for post-conviction relief. The trial court denied the claims as follows:

> A claim of ineffective assistance of counsel is reviewed under the two part test set out in *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed.2d 674 (1984).  In order to prevail on an ineffective assistance claim, a defendant must establish both that counsel's performance was deficient and that this deficiency prejudiced the defendant.  To carry that burden, the defendant must show that there

---

[314] *Edwards v. Vannoy*, 141 S. Ct. 1547, 1562 (2021),

[315] *See United States v. Lopez-Velasquez*, 526 F.3d 804, 808 n.1 (5th Cir. 2008) ("Absent an intervening Supreme Court case overruling prior precedent, we remain bound to follow our precedent even when the Supreme Court grants certiorari on an issue.") (citing *United States v. Short*, 181 F.3d 620, 624 (5th Cir. 1999), and *Ellis v. Collins*, 956 F.2d 76, 79 (5th Cir. 1992)).

is a reasonable probability that, but for counsel's deficient performance the result of the proceeding would have been different. Defendant cites in support of his claim that counsel should have objected to the victim's presence in the courtroom during other witnesses' testimony La. C.E. Art. 615, as well as the Sixth and Fourteenth Amendments.

La. C.E. Art. 615 provides that upon the court's own motion or that of a party, witnesses may be excluded from the courtroom in order that they do not see or hear the trial proceedings prior to testifying. Article 615 also provides in section B(4) that this exclusion from the courtroom does not authorize the exclusion of "the victim of the offense or the family of the victim." Therefore, the defendant's argument that his attorney was ineffective for failing to object to something that was legal makes no sense. Counsel cannot be deficient, as required by the front prong of the *Strickland* test, for not objecting to something that is not objectionable by law.

Furthermore, the defendant does not provide evidence that the victim was actually in the courtroom during the testimony of the State's witnesses. This Court recalls that the victim did NOT wish to be in the courtroom in the presence of the defendant. Additionally, the defendant does not present anything that suggests that the victim's testimony was influenced by any prior witnesses' testimony.

Therefore, the first prong of the *Strickland* test requiring that counsel's performance be deficient is not met and claim one is denied.

Defendant's second claim is that counsel was ineffective for failing to object to comments made by the assistant district attorney during opening statements and closing argument. Specifically, defendant alleges that the assistant district attorney stated during closing that society needs to be protected from predators like the defendant.

In an abundance of caution, this Court listened to the trial tapes in order to hear the entirety of the State's opening statement and closing argument.[1] After reviewing the trial tapes, this Court finds that the State did not make any such statement regarding society needing to be protected from persons like that defendant. This Court further finds that the State did not make any comments similar to those alleged by the defendant.

[1] This Court had to listen to the trial tapes due to the policy that only objections made during opening statements and closing arguments are transcribed rather than the statements and arguments in their entirety. The jurors are also instructed that opening and closing are not to be considered as evidence.

In addition, the jurors are always instructed in this Court's standard jury charge that "the contents of the opening statement as well as the closing arguments are not to be considered as evidence in this case."

Defendant's third and final claim is that this Court erred by allowing the defendant to be convicted with a non-unanimous verdict and that his counsel was ineffective for failing to object to the non-unanimous verdict. Louisiana Code of Criminal Procedure Article 782 clearly provides that "cases in which punishment is necessarily confinement at hard labor shall be tried by a jury composed of twelve jurors, ten of whom must concur to render a verdict." Therefore, this Court did not err by proceeding in accordance with the law. Nor did defense counsel perform deficiently for not objecting to a lawful procedure. The first prong of the *Strickland* test is not satisfied and the claim is denied.[316]

The Louisiana Fourth Circuit Court of Appeals found that the state district court did not err in rejecting Hawthorne's claim of ineffective assistance of counsel.[317] Likewise, the Louisiana Supreme Court held that Hawthorne failed to show that he received ineffective assistance of counsel under *Strickland*.[318]

## 2. **AEDPA Standards and *Strickland***

The issue of ineffective assistance of counsel is a mixed question of law and fact.[319] Thus, under the AEDPA, this court must determine whether the state courts' denial of relief was contrary to or an unreasonable application of Supreme Court precedent.

The United States Supreme Court established a two-part test for evaluating claims of ineffective assistance of counsel, requiring petitioner to prove both deficient performance and resulting prejudice.[320] The Supreme Court first held that "the defendant must show that counsel's representation fell below an objective standard of reasonableness."[321] Second, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."[322]

---

[316] St. R. Vol. 9 of 9, Ruling on Application for Post-Conviction Relief, at 1-3, 2/25/19.

[317] St. R. Vol. 9 of 9, La. App. 4th Cir. Order, 2020-K-0106, 3/3/20.

[318] *Hawthorne*, 301 So. 3d at 1158; St. R. Vol. 9 of 9, La. Sup. Ct. Order, 2020-KH-00586, 9/29/20.

[319] *Strickland v. Washington*, 466 U.S. 688, 698 (1984); *Clark v. Thaler*, 673 F.3d 410, 416 (5th Cir. 2012); *Woodfox v. Cain*, 609 F.3d 774, 789 (5th Cir. 2010).

[320] 466 U.S. at 697.

[321] *Id.* at 687-88.

[322] *Id.* at 694; *United States v. Kimler*, 167 F.3d 889, 893 (5th Cir. 1999).

In deciding ineffective assistance of counsel claims, a court need not address both prongs of the conjunctive *Strickland* standard, but may dispose of such a claim based solely on a petitioner's failure to meet either prong of the test.[323]  A habeas corpus petitioner "need not show that 'counsel's deficient conduct more likely than not altered the outcome in the case.' . . . But it is not enough under *Strickland*, 'that the errors had some conceivable effect on the outcome of the proceeding.'"[324]

On habeas review, the United States Supreme Court has clarified that, under *Strickland*, "[t]he question is whether an attorney's representation amounted to incompetence under prevailing professional norms, not whether it deviated from best practices or most common custom."[325] "Even under de novo review, the standard for judging counsel's representation is a most deferential one."[326]  The courts must therefore apply the "strong presumption" that counsel's strategy and defense tactics fall "within the wide range of reasonable professional assistance."[327]

Federal habeas courts presume that litigation strategy is objectively reasonable unless clearly proven otherwise by the petitioner.[328]  "It is all too tempting to second-guess counsel's assistance after conviction or adverse sentence."[329]  In assessing counsel's performance, a federal habeas court must make every effort to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's

---

[323] *Kimler*, 167 F.3d at 893.
[324] *Motley v. Collins*, 18 F.3d 1223, 1226 (5th Cir. 1994) (citation omitted) (quoting *Strickland*, 466 U.S. at 693); *Harrington*, 562 U.S. at 112 (*Strickland* requires a "substantial" likelihood of a different result, not just "conceivable" one.)
[325] *Harrington*, 562 U.S. at 105.
[326] *Id.*
[327] *Strickland*, 466 U.S. at 690.
[328] *Id.* at 689; *Geiger v. Cain*, 540 F.3d 303, 309 (5th Cir. 2008); *Moore v. Johnson*, 194 F.3d 586, 591 (5th Cir. 1999).
[329] *Harrington*, 562 U.S. at 105.

perspective at the time of trial.[330]  Tactical decisions, when supported by the circumstances, are objectively reasonable and do not amount to unconstitutionally deficient performance.[331]

### a.  Claim 3(b): Failure to Object to the Victim's Presence in the Courtroom

Hawthorne first claims that his trial counsel was ineffective in failing to object, pursuant to LA. CODE EVID. art. 615, to the victim's presence in the courtroom prior to her testimony and throughout the State's case-in-chief.  The State responds that the state courts' decision was not unreasonable.

Louisiana Code of Evidence article 615 governs the sequestration of witnesses at trial.  LA. CODE EVID. art. 615(A) provides in pertinent part:

> As a matter of right.  On its own motion the court may, and on request of a party the court shall, order that the witnesses be excluded from the courtroom or from a place where they can see or hear the proceedings, and refrain from discussing the facts of the case with anyone other than counsel in the case.  In the interests of justice, the court may exempt any witness from its order of exclusion.

Article 615(B), however, makes clear that the victim of the offense *cannot* be excluded and is not subject to the sequestration order:

> Exceptions.  This Article does not authorize exclusion of any of the following:
> . . .
> (4)  The victim of the offense or the family of the victim.[332]

The trial court thus lacked the authority to exclude the victim from the courtroom during trial.

Hawthorne argues that the victim was required to testify before the sequestration exemption could be effective.  He is incorrect.  While the original 1988 version of article 615 that exempted a victim from a sequestration order also provided that "the court shall require that the

---

[330] *Strickland*, 466 U.S. at 689; *Neal*, 286 F.3d at 236-37; *Clark v. Johnson*, 227 F.3d 273, 282-83 (5th Cir. 2000), *cert. denied*, 531 U.S. 1167 (2001).

[331] *Lamb v. Johnson*, 179 F.3d 352, 358 (5th Cir. 1999) (citing *Rector v. Johnson*, 120 F.3d 551, 564 (5th Cir. 1997); *Mann v. Scott*, 41 F.3d 968, 983-84 (5th Cir. 1994)).

[332] LA. CODE EVID. art. 615(B) (providing "victims have a right to be in the courtroom and are not subject to a sequestration order.").

victim give his testimony before the exemption is effective and the court shall at that time prohibit the prosecution from recalling the victim as a witness in the state's prosecution in chief and in rebuttal,"[333] that provision was later revised.  Under the current version of the law in effect at the time of Hawthorne's trial, "victims have a right to be in the courtroom and are not subject to a sequestration order."[334]  As a result, no objection could properly be lodged on that basis.

Had defense counsel raised a sequestration objection to the victim's presence (either before or after her testimony), it would have been overruled as meritless.[335]  Counsel did not act deficiently or prejudicially in failing to present a meritless objection or motion.[336]  The denial of relief on this issue was not contrary to or an unreasonable application of *Strickland*.  Hawthorne is not entitled to relief on this issue.

### b. <u>Claim 5(c): Object to Prosecutorial Misconduct</u>

Hawthorne next claims his trial counsel was ineffective in failing to object to statements made by the prosecutor during opening statement and closing arguments.

As previously explained, the transcript reflects that the prosecutor did not make any of the statements alleged by Hawthorne in opening statement, closing argument or rebuttal.  As there was no such statement, defense counsel could not be ineffective in failing to object.[337]  Because there

---

[333] LA. CODE EVID. art 615(A)(4) (1988); *see* Historical and Statutory Notes citing Louisiana Acts 1999, No. 783.

[334] *State v. Jones*, 982 So. 2d 105, 117 n.2 (La. App. 2d Cir. 2/20/08) (citation omitted) (rejecting a defendant's argument that the victim was required to give testimony before being exempt from the sequestration order and noting that article 615 was amended to its present form by Acts 1999, No. 783, § 2, which became effective January 1, 2000) (citation omitted).

[335] *See Wood v. Quarterman*, 503 F.3d 408, 413 (5th Cir. 2007) ("'[F]ailure to raise meritless objections is not ineffective lawyering; it is the very opposite.'") (quoting *Clark v. Collins*, 19 F.3d 959, 966 (5th Cir. 1994); *see also Koch v. Puckett*, 907 F.2d 524, 527 (5th Cir. 1990) ("This Court has made clear that counsel is not required to make futile motions or objections.")).

[336] *See Smith v. Puckett*, 907 F.2d 581, 585 n.6 (5th Cir.1990) ("Counsel is not deficient for, and prejudice does not issue from, failure to raise a legally meritless claim."); *Koch v. Puckett*, 907 F.2d 524, 530 (5th Cir.1990) (concluding that "counsel is not required to make futile motions or objections.").

[337] *Johnson v. Cockrell*, 306 F.3d 249, 255 (5th Cir. 2002); *Smith*, 907 F.2d at 585 n.6; *Koch*, 907 F.2d at

was no misconduct in the manner in which the opening statement and closing argument was made, Hawthorne's counsel cannot be faulted for failing to object.[338]

Hawthorne has failed to show that his counsel was ineffective in failing to object to opening statement or closing argument. He further fails to show any resulting prejudice. The denial of relief on this issue was not contrary to or an unreasonable application of *Strickland*. Hawthorne is not entitled to relief on this issue.

### c. Claim 6: Object to Non-Unanimous Verdict Prosecutorial Misconduct

Hawthorne claims his trial counsel was ineffective for failing to challenge the non-unanimous jury verdict at trial.

For the reasons previously explained, there was no legal basis for Hawthorne's counsel to have challenged Louisiana's non-unanimous verdict rule or the verdict. A non-unanimous verdict in Louisiana was not unlawful or unconstitutional under the Supreme Court law in place at the time of Hawthorne's conviction. His trial counsel had no precedent to support a successful challenge at that time. His counsel was not ineffective for failing to urge a meritless claim.[339]

For these reasons, Hawthorne's claim of ineffective assistance of trial counsel for failing to object to the non-unanimous verdict has no merit. The denial of relief on this issue was not contrary to or an unreasonable application of *Strickland*. Hawthorne is not entitled to relief on this issue.

---

527.
[338] *See Wood*, 503 F.3d at 413; *Smith*, 907 F.2d at 585 n.6 ; *Koch*, 907 F.2d at 530.
[339] *Johnson*, 306 F.3d at 255; *Smith*, 907 F.2d at n.6; *Koch*, 907 F.2d at 527.

### **RECOMMENDATION**

For the foregoing reasons, it is **RECOMMENDED** that Curtis Hawthorne's petition for issuance of a writ of habeas corpus under 28 U.S.C. § 2254 be **DISMISSED WITH PREJUDICE**.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within fourteen (14) days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object.[340]

New Orleans, Louisiana, this ___19th___ day of October, 2023.

DONNA PHILLIPS CURRAULT
UNITED STATES MAGISTRATE JUDGE

---

[340] *Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1430 (5th Cir. 1996) (*en banc*) (citing 28 U.S.C. § 636(b)(1)). *Douglass* referred to the previously applicable ten-day period for filing of objections, which was extended to fourteen days by amendment effective December 1, 2009, 28 U.S.C. § 636(b)(1).